**UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF COLORADO**
Bankruptcy Judge Thomas B. McNamara

| | |
|---|---|
| In re:<br><br>MATTHEW JASON MENNONA and<br>NICOLE MARIE MENNONA,<br><br>Debtors. | Bankruptcy Case No. 21-11967 TBM<br><br>Chapter 7 |
| PATRICK S. LAYNG, United States<br>Trustee, Region 19,<br><br>Plaintiff,<br><br>v.<br><br>DEVON MICHAEL BARCLAY and<br>DEVON BARCLAY, P.C.,<br><br>Defendants. | Adv. Pro. No. 22-1139 TBM |

## MEMORANDUM OPINION AFTER TRIAL

### I.    Introduction.

The Debtors, Matthew Jason Mennona and Nicole Marie Mennona (together, the "Debtors") engaged attorney Devon Michael Barclay ("Mr. Barclay") and his wholly-owned law firm, Devon Barclay, P.C. ("DBPC," together with Mr. Barclay, the "Defendants"), as bankruptcy counsel.  In violation of Section 528(a) of the Bankruptcy Code,[1] the Defendants failed to execute a written contract with the Debtors.  In any event, Mr. Barclay commenced the Debtors' Chapter 7 bankruptcy case by forging the Debtors' signatures on the Petition, Statement of Financial Affairs, and Schedules.  Then, he filed a knowingly false application for the Debtors to pay the bankruptcy filing fee in installments and submitted an incorrect Schedule A/B.  The Chapter 7 Trustee appointed in the Debtors' bankruptcy case started to investigate the Debtors' assets and financial condition.  At that point, the Defendants engaged in an egregious pattern of further misbehavior trying to dismiss the Debtors' bankruptcy case.  Mr. Barclay lied repeatedly

---

[1]    All references to the "Bankruptcy Code" are to the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq*.  Unless otherwise indicated, all references to "Section" are to sections of the Bankruptcy Code.

to the Chapter 7 Trustee at the Section 341 meeting of creditors about the Debtors' failure to appear.  He tried to manipulate the bankruptcy filing fee system to cause the bankruptcy case to be dismissed.  Mr. Barclay filed multiple motions to dismiss based upon false assertions of fact.  He ignored informal and formal discovery efforts initiated by the Chapter 7 Trustee, thus causing his clients to be sanctioned by the Court.  Mr. Barclay failed to communicate with the Debtors and provided incompetent legal services.  To top it all off, Mr. Barclay advised his clients to try to infect the Chapter 7 Trustee's legal counsel with "COVID or some highly infectious disease."  Then he solicited a third-party creditor to engage in a further fraud on the Court with yet another strange dismissal scheme.

As the Supreme Court has observed: "lawyers are officers of the court who perform a fundamental role in the administration of justice."  *Spevack v. Klein*, 385 U.S. 511, 524 (1967).  This is especially true in bankruptcy proceedings where consumer debtors are financially strapped and often not sophisticated in the technicalities of bankruptcy cases.  *See SE Prop. Holdings, LLC v. Stewart (In re Stewart)*, 970 F.3d 1255, 1258 (10th Cir. 2020) ("Attorneys for debtors perform an essential role in bankruptcy proceedings.").  Competent counsel is critical.  The integrity of the judicial system depends on the Court's ability to rely on the honesty and professionalism of attorneys appearing before it.

What Mr. Barclay and DBPC did was an affront to the administration of justice and highly detrimental to the Debtors.  After Mr. Barclay's malfeasance was discovered, the United States Trustee (the "UST") commenced this Adversary Proceeding against the Defendants and asserted claims for: (1) violations of Fed. R. Bank. P. 1008 and 9011; (2) violations of Section 526(a)(2); (3) violations of Sections 526(a)(1) and (a)(3); (4) violations of Section 528; and (5) violations of professional duties.  The Defendants initially filed a deficient answer to the complaint, then answered the complaint (admitting most of the factual allegations), then withdrew their answer and defaulted.  The Defendants failed to participate in pre-trial proceedings and skipped the trial.  They offered no evidence or defense.  Thus, all of the factual allegations asserted by the UST have been deemed admitted.

With no contest over the facts or the Defendants' liability under all the causes of action stated by the UST, the primary remaining issue for the Court is to determine the appropriate sanctions to be imposed on the Defendants for their blatant misconduct.  The Defendants' malfeasance demands severe sanctions.  Accordingly, the Court suspends the Defendants from the practice of law in the United States Bankruptcy Court for the District of Colorado for a term of three years.  The Court also imposes some additional ancillary sanctions.

## II.   <u>Jurisdiction and Venue</u>.

The Court has subject matter jurisdiction over this Adversary Proceeding concerning bankruptcy attorney misconduct pursuant to 28 U.S.C. §§ 157 and 1334.  Furthermore, this is a core proceeding under 28 U.S.C. § 157(b)(2)(A) (matters concerning administration of the estate).  Both the UST and the Defendants consented to

the Court's jurisdiction to enter final judgment with respect to all the claims and defenses asserted in this Adversary Proceeding.[2]  Venue is proper in this Court under 28 U.S.C. §§ 1408 and 1409.

### III.    Procedural Background.[3]

### A.    The Bankruptcy Case.

On April 16, 2021, Mr. Barclay, acting through his law firm (DBPC) and purportedly on behalf of the Debtors, filed a joint voluntary petition for relief under Chapter 7 of the Bankruptcy Code (the "Petition")[4] thereby initiating the bankruptcy case captioned:  *In re Mennona*, 21-11967 (Bankr. D. Colo.) (the "Main Case").  Promptly thereafter, Simon E. Rodriguez was appointed as the Chapter 7 Trustee for the Debtors' estate (the "Chapter 7 Trustee").[5]  The Chapter 7 Trustee issued a "Notice of Possible Dividends"[6] and began efforts to administer the Main Case and recover assets for the benefit of creditors.  In response, Mr. Barclay (often acting without the knowledge or consent of the Debtors) engaged in various fraudulent schemes to thwart bankruptcy administration and cause the Main Case to be dismissed.  Mr. Barclay's misconduct ultimately resulted in the Court sanctioning the Debtors while keeping the Main Case open.[7]

After some of Mr. Barclay's malfeasance was discovered, the Debtors secured substitute counsel, Stephen Berken ("Substitute Counsel"), in place of the Defendants.[8]  Then the Debtors sued Barclay and DBPC for their misconduct.[9]  The Debtors and the Chapter 7 Trustee later settled certain malpractice-oriented claims against the Defendants.  As a result, the Chapter 7 Trustee recovered sufficient funds to enable him to pay the allowed administrative expense claims and allowed unsecured claims against the Debtors' estate in full.[10]  And, the Debtors eventually received their bankruptcy discharge along with a small surplus.[11]

The result of the Main Case may be viewed as a success because the claims against the Debtors' estate were satisfied and the Debtors received their discharge.  However, that success was achieved only through the settlement of the malpractice claims brought against Mr. Barclay who had engaged in egregious lawyer misconduct

---

[2]    Docket Nos. 16 and 19.  The Court uses the convention "Docket No. ___" to refer to a document filed in the CM/ECF system for this Adversary Proceeding.  When referring to a document filed in the CM/ECF system for the Debtors' main bankruptcy case, *In re Mennona*, Case No. 21-11967 TBM (Bankr. D. Colo.), the Court identifies the documents as follows: "Docket No. ___ in Main Case".

[3]    The Court takes judicial notice of the docket in this case.  *See St. Louis Baptist Temple, Inc. v. F.D.I.C.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may sua sponte take judicial notice of its docket and of facts that are part of public records).

[4]    Docket No. 1 in Main Case.

[5]    Docket No. 11 in Main Case.

[6]    Docket No. 20 in Main Case.

[7]    Docket No. 85 in Main Case.

[8]    Docket No. 96 in Main Case.

[9]    Docket No. 123 in Main Case.

[10]    Docket Nos. 147, 153, 172, and 179 in Main Case.

[11]    Docket No. 142 in Main Case.

throughout his tenure in the Main Case.  The details of Mr. Barclay's appalling abuse of the bankruptcy system are set forth below as part of the Court's Findings of Fact.

**B.    The Adversary Proceeding.**

    **1.  The Complaint.**

On April 21, 2022, the UST initiated this Adversary Proceeding by filing his "Complaint" (the "Complaint").[12]  The Complaint is extremely comprehensive: it spans 240 paragraphs plus more than 100 pages of supporting exhibits.  Most of the Complaint consists of factual allegations detailing Mr. Barclay's pattern of gross misconduct in the Main Case.  Among the myriad transgressions alleged in the Complaint, the UST asserts that Mr. Barclay: failed to execute a written contract with the Debtors; forged the Debtors' electronic signatures on the Petition and other documents; knowingly submitted inaccurate Schedules; improperly advised the Debtors not to appear at the Section 341 meeting of creditors; lied to the Chapter 7 Trustee at the Section 341 meeting of creditors; devised and tried to implement multiple improper schemes for dismissal of the Main Case; failed to properly communicate with the Debtors concerning their obligation to produce documents thereby causing the Debtors to be sanctioned by the Court; disparaged the Chapter 7 Trustee and encouraged an effort to infect the Chapter 7 Trustee's counsel with "COVID or some other highly infectious, nasty disease"; made numerous misrepresentations to the Court; and tried to defraud the Court through a fraudulent scheme proposed to a creditor in an effort to cause the Main Bankruptcy Case to be dismissed.  The foregoing is merely a summary of some of the factual assertions advanced by the UST, many of which are directly supported by the myriad of exhibits attached to the Complaint.  The Complaint contains more factual allegations about Mr. Barclay's misconduct.  Many, many more.  Since Mr. Barclay is the sole owner and principal of his law firm (DBPC), the claims also were asserted against DBPC based on Mr. Barclay's misconduct.

Based upon the factual assertions, the UST stated five causes of action against the Defendants as follows: (1) violations of Fed. R. Bank. P. 1008 and 9011; (2) violations of Section 526(a)(2); (3) violations of Sections 526(a)(1) and (a)(3); (4) violations of Section 528; and (5) violations of professional duties.  In the Complaint, the UST requested a series of remedies including: voiding any contractual arrangement with the Debtors; imposing sanctions, fines, and penalties; entering injunctive relief to bar future violations; prohibiting the Defendants from practicing law in the United States Bankruptcy Court for the District of Colorado; and referring Mr. Barclay's misconduct to the Disciplinary Panel or the Committee on Conduct of the United States District Court for the District of Colorado (the "District Court").  The remedies requested by the UST are among the most serious that the Court may impose against a bankruptcy lawyer.

---

[12]    Docket No. 1.

2.    **The Initial Response**.

The Defendants initially responded to the Complaint by filing a document titled "Response" (the "Response").[13]  Use of the title "Response" is curious because the Response is best characterized as a non-compliant non-response.  Fed. R. Civ. P. 12, as incorporated by Fed. R. Bankr. P. 7012, provides that a defendant must serve an "answer within 30 days after the issuance of the summons" unless the defendant serves a "motion permitted under this rule . . . ."  The Response was not a "motion permitted under" Fed. R. Civ. P. 12, as incorporated under Fed. R. Bankr. P. 7012.  So, the Response seemed to be an attempt at an "answer" to the Complaint.  Per Fed. R. Civ. P. 7(a)(2), as incorporated by Fed. R. Bankr. P. 7007, both a "complaint" and an "answer to a complaint" are "pleadings."  Fed. R. Civ. P. 8(b), as incorporated by Fed. R. Bankr. P. 7008, explains the "general rules of pleading" when responding to a complaint.  Chief among them is that a defendant must "admit or deny the allegations [made in the complaint] . . . ."

In the Response, the Defendants violated the main pleading requirements.  Mr. Barclay asserted that he had "been advised by counsel to avoid speaking in detail about the allegations between 122-131 of the [C]omplaint, for fears that anything said could be used in whatever context for prosecution, whatever the ultimate merits, by the UST."  But then the Defendants stated that "*Defendants enter qualified admissions to every accusation in the Complaint*."  (Emphasis added.)  The Defendants did not explain what they meant by "qualified" admissions.  In any event, the Defendants did not stop there.  They purported to address "Allegations 19-33" of the Complaint by admitting that they "were without signed copies of the petition when the case was filed" and presented some narrative but otherwise did not specifically admit or deny any allegations in the Complaint.  Then, the Defendants referred to "Allegations 34-45" of the Complaint.  However, they did not expressly admit or deny any of those allegations either.  Instead, they presented some commentary.  Later, the Defendants cited "Allegations 65-121" of the Complaint, but did not admit or deny any such allegations and instead advanced some argument.  Next, the Defendants addressed "Allegations 122-131" of the Complaint by mentioning a completely inapposite statute — Section 561 — and then provided some explanations before calling allegations of "fraudulent or nefarious intent . . . not only unrealistic but absurd."  Per their *modus operandi*, the Defendants failed to admit or deny any specific allegations in the Complaint.  Next, the Defendants engaged in what can best be described as a diatribe accusing the UST and others of acting "unethically" and failing to fulfill their obligations.  The Defendants ended the Response by attaching a copy of a letter Mr. Barclay prepared and addressed to "United States Attorney" accusing the UST, multiple Chapter 7 Trustees, and various bankruptcy lawyers of "serious abuse," "abuse of power," "actual bankruptcy fraud," "violat[ions] of . . . duties as a fiduciary," and otherwise allegedly nefarious conduct.[14]

---

[13]    Docket No. 4.
[14]    Docket No. 5.

### 3.      The Motion for More Definite Answer.

Given the obvious deficiencies in the Response, the UST filed a "Motion for More Definite Answer to Complaint" (the "Motion for More Definite Answer").[15]  In support of his position, the UST cited Fed. R. R. Civ. P. 8(b) and argued that Fed. R. Civ. P. 8(b) "only permits three possible responses to a compliant: (1) admission; (2) denial; or (3) a disclaimer statement in compliance with Rule 8(b)'s provision for lack of knowledge and information, which is deemed a denial."  *McSweeney v. Janes*, 2014 WL 3707788, at *2 (D. Colo. July 24, 2014).  The UST pointed out that the Defendants' purported "qualified admissions" coupled with the other text of the Response were "inconsistent" and that the Response "does not comport with the pleading requirements of Fed. R. Civ. P. 8(b), and as a result, the UST is left to guess" about Barclay's position with respect to the allegations in the Complaint.[16]  The UST did not request that the defective Response be deemed an admission of all the allegations in the Complaint and did not ask that the Defendants be sanctioned for failing to properly respond to the Complaint.  Instead, the UST asked only that the Defendants be ordered to follow Fed. R. Civ. P. 8(b) and specifically admit or deny the allegations in the Complaint.  In other words, the UST proposed to give the Defendants another chance to answer the Complaint the right way.

The Defendants did not respond to the Motion for More Definite Answer in writing within the 14-day period set by L.B.R. 7007-1.  However, the Court elected to defer ruling on the Motion for More Definite Answer in order to provide the Defendants a further opportunity to respond orally during an already-set Pretrial Scheduling Conference.

### 4.      The Joint Report and Pretrial Scheduling Conference.

The Court set a Pretrial Scheduling Conference for June 28, 2022 (the "Scheduling Conference").  In advance of the Scheduling Conference, the UST and the Defendants submitted their "Joint Report,"[17] wherein the parties proposed various pretrial deadlines for this Adversary Proceeding.  Among other things, the Defendants agreed that this Court "has jurisdiction over this Adversary Proceeding pursuant to 28 U.S.C. §§ 157(a), 157(b)(1), and 1334(b)" and that this Court "has authority to enter [a] final order or judgment with respect to the claims asserted in this Adversary Proceeding."

Both the UST and the Defendants appeared at the Scheduling Conference.[18]  Mr. Barclay entered his appearance on behalf of himself and his law firm.[19]  The Court

---

[15]     Docket No. 10.

[16]     *Id.* at 4.

[17]     Docket No. 16.

[18]     Docket No. 19.

[19]     Mr. Barclay represented himself and DBPC throughout this Adversary Proceeding.  Despite admonitions to obtain counsel to represent him, Mr. Barclay elected not to do so.  Thus, Mr. Barclay proceeded *pro se*.   Normally, the Court is charged with liberally construing the papers filed by *pro se* parties. *Thompson v. Coulter*, 680 Fed. Appx. 707, 710 (10th Cir. 2017) (citing *Garrett v. Selby Connor Maddux & Janer*, 425 F.3d 836, 840 (10th Cir. 2005)); *Hall v. Bellmon*, 935 F.2d 1106, 1110 (10th Cir. 1991).  However, when the *pro se* party is a licensed attorney, courts are not required to extend "the same liberality [afforded] to a pro se pleading." *Davison v. Comm'r*, 2022 WL 2196884, at *4 (10th Cir. Jun. 17,

encouraged the Defendants to consider retaining other legal counsel.  However, Mr. Barclay continued to represent himself and his law firm and never engaged other legal counsel in this Adversary Proceeding.  At the Scheduling Conference, the Court entertained legal argument on the pending Motion for More Definite Answer.  The Defendants did not oppose the relief requested in the Motion for More Definite Answer.  Accordingly, the Court entered an "Order Granting Motion for More Definite Answer" and directed:

> . . . by July 8, 2022, Devon Michael Barclay and Devon Barclay, P.C. (collectively, "Defendants"), shall file a more definite answer . . . responding specifically to each of the numbered paragraphs in the Complaint consistent with the pleading requirements of Fed. R. Civ. P. 8(b), and failing which all allegations in the Complaint shall be deemed admitted consistent with Fed. R. Civ. P. 8(b)(6).[20]

The Court also issued a "Scheduling Order" (the "Scheduling Order") and set the trial in this Adversary Proceeding for November 3, 2022.[21]

### 5.   The Answer.

Subsequently, on July 8, 2022, the Defendants filed another "Response" (the "Answer") responding to the Complaint.[22]  In the Answer, the Defendants admitted without qualification most of the factual allegations asserted in the Complaint: approximately 152 Paragraphs out of 240 Paragraphs.  With respect to the remaining allegations, the Defendants either: (1) denied such allegations in part; (2) denied such allegations in full; (3) stated that they "lack[] the information to admit or deny"; or (4) noted that the specific allegations were not allegations "requiring admission or denial."  Additionally, the Defendants asserted a series of affirmative defenses.

### 6.   The Trial.

Months passed.  With the trial rapidly approaching, on October 13, 2022, the Defendants filed an unsigned document titled: "Mitigation."[23]  The purpose of the document was unclear.  It was not a pleading, answer, or motion.  However, before the Court had an opportunity to assess it, the Defendants withdrew the first "Mitigation."[24]  Meanwhile, the Defendants filed a different unsigned document titled: "Mitigation."[25]  Like its predecessor, it also was not a pleading, answer, or motion and mostly consisted of an attack on the Chapter 7 Trustee and various bankruptcy professionals.  In the CM/ECF

---

2022) (citing *Mann v. Boatright*, 477 F.3d 1140, 1148 n.4 (10th Cir. 2007)).  Because Mr. Barclay is a licensed attorney who regularly practices in this Court, this Court need not construe his deficient papers liberally.

[20]   Docket Nos. 19 and 21.
[21]   Docket Nos. 19 and 20.
[22]   Docket No. 26.
[23]   Docket No. 31.
[24]   Docket No. 36.
[25]   Docket No. 32.

system, the Defendants characterized the second "Mitigation" as a "List of Witnesses and Exhibits." However, the second "Mitigation" did not identify any witnesses or exhibits for the trial. In any event, the Court received a "Motion to Strike" the second "Mitigation."[26] The Defendants did not respond. So, the Court ordered the second "Mitigation" stricken from the record.[27] Meanwhile, the Defendants and the UST also agreed to a "Joint Statement of Stipulated Facts and Exhibits" (the "Stipulated Facts").[28]

Given the Defendants' unusual litigation behavior, along with their failure to meet the deadline for submitting a witness and exhibit list and exchanging trial exhibits with the UST, the Court *sua sponte* set a Final Pretrial Conference.[29] The evening before the Final Pretrial Conference, the Defendants filed a document titled "Notice of Withdrawal of Documents, and of Default" (the "Withdrawal") which stated (in its entirety):

> Undersigned counsel [Barclay] hereby withdraws the Defendants' Answer (Docket No. 26) and Answer (Docket No. 4). Defendants default. The Court can and should enter final orders at its discretion. [30]

On October 27, 2022 (just a few days before the long-scheduled trial), the Court conducted the Final Pretrial Conference. The Defendants did not attend. The Court issued an "Order to Show Cause Why Sanctions Should Not Be Imposed on Defendants for their Failure to Appear" (the "Order to Show Cause").[31] However, the Court conducted the Final Pretrial Conference in Mr. Barclay's absence and received input from the UST. Thereafter, the Court issued an oral ruling on the effect of the Withdrawal filed by the Defendants.[32] The Court determined that because the Defendants had withdrawn the Answer, all factual allegations contained in the Complaint (and incorporated exhibits) were deemed admitted pursuant to Fed. R. Civ. P. 8(b)(6) and governing law.[33] The Court also decided that the Defendants had defaulted and instructed the Clerk of Court to enter such default pursuant to Fed. R. Civ. P. 55(a), as incorporated by Fed. R. Bankr. P. 7055.[34]

After the foregoing rulings, the Court inquired whether the UST wished to introduce any additional evidence beyond the admitted factual allegations contained in the Complaint (and incorporated exhibits). The UST elected to forego the presentation of any other testimony or exhibits at trial and instead rested its evidentiary case solely on the admitted factual allegations contained in the Complaint (and incorporated exhibits).[35] Thereafter, the Court declared that "the evidence is closed and the Court will take no

---

[26]     Docket No. 41.
[27]     Docket Nos. 45 and 49.
[28]     Docket No. 38.
[29]     Docket No. 35.
[30]     Docket No. 43.
[31]     Docket Nos. 45 and 48.
[32]     Docket No. 45.
[33]     *Id.*
[34]     *Id.*
[35]     *Id.*

further evidence at the time of trial."[36]  Instead, the Court confirmed that at the trial it would only entertain closing arguments from the UST and the Defendants "including the precise remedy the UST asks the Court to impose on the Defendants."[37]  The Court also provided a further opportunity for the UST and the Defendants to submit additional legal briefing "pertaining the remedies the UST seeks to have imposed."[38]  The day after the Final Pretrial Conference, the Clerk of Court issued the "Clerk's Entry of Default" determining that "Defendants Devon Michael Barclay and Devon Barclay, P.C., are in default pursuant to Fed. R. Civ. P. 55(a), made applicable by Fed. R. Bankr. P. 7055."[39]

A few days before the trial, Mr. Barclay responded to the Order to Show Cause and indicated that "preceding the pretrial conference" he had experienced various adverse medical conditions and was diagnosed with "Adjustment Disorder" which he characterized as a "physical reaction to psychological trauma" caused by this Adversary Proceeding.[40]  The Defendants again confirmed their intention to default and stated:

> 8.     Having already withdrawn his answer, Barclay and his firm are without standing to appear and defend any allegations involved in the Complaint.
>
> 9.     Barclay cannot obey court orders that threaten his life, as it appears this case now may.
>
> 10.    Barclay needed medical attention which took priority over appearing at the hearing.  This was unexpected and Barclay should not be sanctioned for that.
>
> 11.    The Bankruptcy Court is a court of equity.  Knowing what the Court knows, the Court should enter whatever ruling it deems fit against Barclay and his company, Devon Barclay, PC and should issue whatever orders it deems appropriate.
>
> 12.    Barclay, based on medical advice, cannot appear at any future hearing on this matter.[41]

The Defendants did not ask that the trial be delayed.  Nor did they request an opportunity to retain substitute counsel.  But, given Mr. Barclay's explanation of his medical circumstances, the Court discharged its Order to Show Cause and did not sanction the Defendants for their failure to appear at the Final Pretrial Conference.

On November 3, 2022, the Court conducted the trial in this Adversary Proceeding. True to his word, Mr. Barclay did not attend.  Given the Court's rulings at the Final Pretrial

---

[36]    *Id.*
[37]    *Id.*
[38]    *Id.*
[39]    Docket No. 47.
[40]    Docket No. 56.
[41]    *Id.*

Conference, the trial consisted only of closing argument presented by the UST.  The UST also filed additional written legal argument and a proposed form of Order.[42]  The Court found the UST's closing argument comprehensive, balanced, professional, and helpful to the Court especially given the very unusual circumstances of this Adversary Proceeding.

## IV.   Findings of Fact.

As set forth above, the Defendants withdrew the Answer.  Accordingly, all the factual allegations in the Complaint (and incorporated exhibits) have been deemed admitted pursuant to Fed. R. Civ. P. 8(b)(6).  *See also Burlington N.R.R. Co. v. Huddleston*, 94 F.3d 1413, 1415 (10th Cir. 1996); *CrossFit, Inc. v. Jenkins*, 69 F. Supp.3d 1088, 1093 (D. Colo. 2014); *Doe v. Hofstetter*, 2012 WL 2319052, at *2 (D. Colo. June 13, 2012).  The Defendants also defaulted under Fed. R. Civ. P. 55.  Furthermore, the Defendants admitted most of the allegations in the Complaint in the Stipulated Facts.  Since the UST elected to proceed based solely on the admitted factual allegations contained in the Complaint (and incorporated exhibits), the Court incorporates by reference each and every factual allegation contained in the Complaint (and incorporated exhibits) and determines that such factual allegations along with the Stipulated Facts constitute the Court's findings of fact under Fed. R. Civ. P. 52(a)(1), as incorporated by Fed. R. Bankr. P. 7052.

The Complaint is extremely comprehensive and consists of 240 separate paragraphs — the majority of which are factual allegations.  The Court declines to repeat verbatim all the factual allegations (and incorporated exhibits).  Instead, the Court identifies only the main evidentiary highlights, which really are better characterized as "lowlights" in the practice of bankruptcy law.

## A.   The Defendants Did Not Execute a Written Attorney-Client Contract with the Debtors.

Mr. Barclay is an attorney admitted to practice law in this Court.  He wholly owns his law firm: DBPC.[43]  Mr. Barclay provides legal services to his clients through DBPC.[44]  The Debtors initially contacted Mr. Barclay about legal representation for a possible bankruptcy case on October 6, 2020.[45]  Shortly thereafter, Mr. Barclay met with the Debtors and began representing them.  He advised them to delay filing for bankruptcy until after they received their anticipated federal tax refund.[46]  Mr. Barclay recommended that the Debtors spend their tax refund (including by paying the Defendants) before seeking bankruptcy protection so that it would not be available to their creditors.[47]

---

[42]     Docket No. 57.
[43]     Compl. ¶¶ 3-4.
[44]     *Id.*
[45]     Compl. ¶ 9.
[46]     Compl. ¶ 11.
[47]     *Id.*

The Defendants did not enter into a written legal services contract with the Debtors prior to providing them with legal advice.  Indeed, the Defendants never executed any sort of written agreement with the Debtors.[48]  Instead, Mr. Barclay merely sent an unexecuted form of draft "Representation Agreement" (the "Representation Agreement") to the Debtors on March 17, 2021.[49]  The form included numerous blank spaces, did not list the Debtors' names, and did not even disclose Mr. Barclay's proposed fee.[50]  Furthermore, through the form, Mr. Barclay falsely asserted that his "rate for attorney's fees" (which was not identified) "is usually free to the client and paid by creditors."[51]  In any event, Mr. Barclay did not ask the Debtors to sign the form Representation Agreement, and never executed it himself.[52]  Notwithstanding the absence of any written agreement executed by the Debtors and the Defendants, the Defendants provided bankruptcy legal services to the Debtors for a year from October 12, 2020 to October 11, 2021.[53]

**B.**    **Mr. Barclay Falsely Indicated that the Debtors Had Signed the Petition, Statement of Financial Affairs, and Schedules Before He Filed the Main Bankruptcy Case.**

Before the commencement of the Main Case, the Debtors met with Mr. Barclay only once: on October 12, 2020.  Many months later, on March 17, 2021, Mr. Barclay sent the Debtors draft bankruptcy documents: a Petition, a Statement of Financial Affairs, and Schedules.[54]  He asked the Debtors to review and sign the materials.[55]  A month later, on April 16, 2021, Mr. Barclay initiated the Main Case for the Debtors by filing the Petition, Statement of Financial Affairs, and Schedules electronically.[56]  Persons seeking bankruptcy protection must execute the petition, statement of financial affairs, and schedules forms when they commence a bankruptcy case.

Part 7 of the petition form instructs debtors to "Sign Below" and states:

> I have examined this petition, and I declare under penalty of perjury that the information is true and correct . . . .  I request relief in accordance with the chapter of title 11, United States Code, specified under this petition.  I understand making false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both.[57]

---

[48]    Compl. ¶ 13.
[49]    Compl. ¶ 14 and Ex. 2.
[50]    *Id.*
[51]    *Id.*
[52]    Compl. ¶¶ 13-17 and Ex. 2.
[53]    Compl. ¶¶ 10-11 and 13-132.
[54]    Compl. ¶ 19 and Ex. 3.
[55]    Compl. ¶¶ 19-20 and Ex. 3.
[56]    Compl. ¶ 26; Docket No. 1 in Main Case.
[57]    Docket No. 1 in Main Case at 6.

Immediately under the foregoing statements, Mr. Barclay inserted the Debtors' electronic signatures in the Petition as follows: "/s/ Matthew Jason Mennona" and "/s/ Nicole Marie Mennona."[58]  He also added the date that the Debtors purportedly had signed the Petition: April 16, 2021.[59]  Further, Mr. Barclay appended his own electronic signature on the Petition along with the April 16, 2021 date.  However, the foregoing was false, and the Defendants knew it.  The Debtors had not signed the Petition on or before April 16, 2021 as represented by Mr. Barclay and stated in the Petition.[60]  In fact, the Debtors were not even aware that Mr. Barclay filed the Main Case until sometime after April 20, 2021.[61]

Similarly, Part 12 of the statement of financial affairs form requires debtors to sign under the statement:

> I have read the answers on this Statement of Financial Affairs and any attachments, and I declare under penalty of perjury that the answers are true and correct.  I understand that making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both.[62]

Immediately under the foregoing statements, Mr. Barclay inserted the Debtors' electronic signatures in the Statement of Financial Affairs as follows: "/s/ Matthew Jason Mennona" and "/s/ Nicole Marie Mennona."[63]  He also added the date that the Debtors purportedly had signed the Statement of Financial Affairs: April 16, 2021.[64]  However, the foregoing was a lie about which the Defendants were aware.  The Debtors had not signed the Statement of Financial Affairs on or before April 16, 2021 as represented by Mr. Barclay and stated in the Statement of Financial Affairs.[65]

At the commencement of a bankruptcy proceeding, debtors also must submit form schedules A-G and a summary of schedules.  Such forms are followed by a "Declaration About an Individual Debtor's Schedules" (the "Declaration").[66]  The Declaration states:

> You must file this form whenever you file bankruptcy schedules or amended schedules.  Making a false statement, concealing property, or obtaining money or property by fraud in connection with a bankruptcy case can result in fines up to $250,000, or imprisonment for up to 20 years, or both.
> . . . .

---

[58]   *Id.*
[59]   *Id.*
[60]   Compl. ¶¶ 28-29.
[61]   Compl. ¶ 33.
[62]   Docket No. 1 in Main Case at 13-14.
[63]   *Id.*
[64]   *Id.*
[65]   Compl. ¶¶ 28-29.
[66]   Docket No. 1 in Main Case at 44.

> Under penalty of perjury, I declare that I have read the
> summary and schedules filed with this declaration and that
> they are true and correct.[67]

Just as with the Petition and the Statement of Financial Affairs, immediately under the foregoing statements, Mr. Barclay inserted the Debtors' electronic signatures in the Declaration as follows: "/s/ Matthew Jason Mennona" and "/s/ Nicole Marie Mennona."[68] He also added the date that the Debtors purportedly had signed the Declaration: April 16, 2021.[69]  However, Mr. Barclay knew that the foregoing was false.  The Debtors had not signed the Declaration on or before April 16, 2021 as represented by Mr. Barclay and stated in the Declaration.[70]

Although the Debtors did not execute the Petition, Statement of Financial Affairs, or Declaration when the Main Bankruptcy Case was started, they executed blank signature pages for the Petition, Statement of Financial Affairs, and Declaration several days later on April 19, 2021, and then sent the original "wet-ink" signature pages to Mr. Barclay the next day.[71]

## C.    Mr. Barclay Knowingly Filed a False Schedule A/B.

As noted above, Mr. Barclay sent the Debtors draft Schedules on March 17, 2021.[72]  At that time, he noted that he had "some questions" to which the Debtors should respond so that the file could be "updated."[73]  The draft Schedules asserted that the Debtors had $0 in their bank accounts.[74]  The next day, March 18, 2021, the Debtors responded to Mr. Barclay and notified him that they had a single bank account with a balance of $5,486.[75]  Thereafter, Mr. Barclay changed the draft Schedule A/B to falsely state that the Debtors had two bank accounts (not one) and that the aggregate balance was $3,950 (not $5,486).[76]  Then, Mr. Barclay filed the false Schedule A/B on the Petition Date without allowing the Debtors an opportunity to review it.[77]  By that time, the amount in the Debtors' sole bank account was $5,000.05.[78]

---

[67]    *Id.*
[68]    *Id.*
[69]    *Id.*
[70]    Compl. ¶¶ 28-29.
[71]    Compl. ¶¶ 30-32 and Ex. 4.
[72]    Compl. ¶ 19 and Ex. 3.
[73]    Compl. Ex. 3.
[74]    Compl. ¶ 22.
[75]    Compl. ¶ 23.
[76]    Compl. ¶¶ 23-24.
[77]    Compl. ¶ 25.
[78]    Compl. ¶ 27.

**D.**   **Mr. Barclay Knowingly Submitted a False Filing Fee Application and Indicated that the Debtors Had Signed the Filing Fee Application Even Though They Had Not.**

Mr. Barclay filed the Main Case as a Chapter 7 liquidation.  At the time, the filing fee for Chapter 7 bankruptcy cases was $338.[79]  The Debtors easily could have paid the $338 filing fee since they had $5,000.05 in cash in their bank account on the Petition Date.  Nevertheless, Mr. Barclay prepared an "Application for Individuals to Pay Filing Fee in Installments" (the "Filing Fee Application")[80] in an effort to delay the payment of the bankruptcy filing fee.  Part 2 of the Filing Fee Application states:

> By signing here, you state that you are unable to pay the full filing fee at once [and] that you want to pay the fee in installments . . . .[81]

Mr. Barclay proposed to the Court that the Debtors pay the $338 filing fee in three installments.  Then, Mr. Barclay inserted the Debtors' electronic signatures in the Filing Fee Application as follows: "/s/ Matthew Jason Mennona" and "/s/ Nicole Marie Mennona."[82]  He also added the date that the Debtors purportedly had signed the Filing Fee Application: April 16, 2021.[83]

All of the foregoing was false.  As of the Petition Date, the Debtors were able to pay the full filing fee since they had $5,000.05 in cash in their bank account.[84]  Also, the Debtors did not sign the Filing Fee Application on April 16, 2021.  In fact, the Debtors never signed the Filing Fee Application — they did not even know about it.[85]  Mr. Barclay never told the Debtors about the Filing Fee Application.[86]  Instead, Mr. Barclay knowingly filed a false and fabricated document with the Court.  Mr. Barclay misled the Court into granting the Filing Fee Application.[87]

**E.**   **Mr. Barclay Lied at the Section 341 Meeting in an Attempt to Have the Main Case Dismissed.**

Not long after the Petition Date, Simon E. Rodriguez was appointed as the Chapter 7 Trustee for the Main Case.[88]  Mr. Barclay dislikes the Chapter 7 Trustee.  Accordingly, in late April or early May 2021, Mr. Barclay advised the Debtors that they needed to have the Main Case dismissed because the Chapter 7 Trustee was "greedy, corrupt, would make their life hell, and would make the Debtors sell their house."[89]

---

[79]   Compl. ¶ 35.
[80]   Docket No. 10 in Main Case; Compl. Ex. 5.
[81]   *Id.*
[82]   *Id.*
[83]   *Id.*
[84]   Compl. ¶ 44.
[85]   Compl. ¶¶ 41-43.
[86]   *Id.*
[87]   Docket No. 12 in Main Case.
[88]   Compl. ¶ 46; Docket No. 11 in Main Case.
[89]   Compl. ¶ 47.

The Chapter 7 Trustee convened the initial Section 341 meeting of creditors in the Main Case on May 17, 2021.[90]  The debtors did not appear.[91]  Before the start of the Section 341 meeting, Mr. Barclay told the Chapter 7 Trustee that the Debtors were not present and he had been unable to reach them.[92]  During the Section 341 meeting, the Chapter 7 Trustee asked Mr. Barclay what steps he had taken to reach the Debtors.  Mr. Barclay told the Chapter 7 Trustee that he had tried to reach the Debtors by telephone and another method.[93]  Based on the foregoing, the Chapter 7 Trustee adjourned the Section 341 meeting to June 14, 2021.[94]

Mr. Barclay's statements during the Section 341 meeting (which is an important part of the bankruptcy process) were false and misleading.  Contrary to his statement that he was unable to reach his clients for the Section 341 meeting, Mr. Barclay had been in touch with the Debtors about the Section 341 meeting.  As part of an improper attempt to orchestrate dismissal of the Main Case, Mr. Barclay expressly advised the Debtors not to attend the Section 341 meeting.[95]  Then he lied to the Chapter 7 Trustee about it.  After the Chapter 7 Trustee rescheduled the Section 341 meeting, Mr. Barclay did the same thing again and advised the Debtors not to attend the adjourned Section 341 meeting either.[96]  As a result, neither Mr. Barclay nor the Debtors appeared at the rescheduled Section 341 meeting.

## F.    Mr. Barclay Manipulated the Filing Fee System in an Attempt to Have the Main Case Dismissed.

As set forth above, Mr. Barclay committed fraud on the Court with respect to the Filing Fee Application.  Based upon his false statements, the Court granted the Filing Fee Application and ordered the Debtors to pay the bankruptcy filing fee in installments: (1) $126 by April 30, 2021; (2) $106 by May 28, 2021; and (3) $106 by June 25, 2021 (the "Filing Fee Order").[97]  The Debtors timely paid the first filing fee installment.[98]  But then, Mr. Barclay made the decision to try to have the Main Case dismissed because of his displeasure with the Chapter 7 Trustee.  Even though the Debtors were financially able to pay the second installment of the filing fee, Mr. Barclay improperly advised them to violate the Filing Fee Order and shirk their obligations to the Court.  Mr. Barclay sent an e-mail to the Debtors stating:

> There are 3 court fee invoices, but don't pay this one — we need the case to get dismissed, and not paying the court fee is the fastest way to get there.[99]

---

[90]    Compl. ¶¶ 52-53.
[91]    Compl. ¶ 52.
[92]    Compl. ¶ 53.
[93]    Compl. ¶ 54.
[94]    Compl. ¶ 55.
[95]    Compl. ¶ 49 and Ex. 1 at 89-91.
[96]    Compl. ¶ 57 and Ex. 6.
[97]    Compl. ¶ 60; Docket No. 12 in Main Case.
[98]    Compl. ¶ 61.
[99]    Compl. ¶ 63 and Ex. 8.

Mr. Barclay did not advise the Debtors concerning the potential ramifications of willful failure to comply with the Filing Fee Order.[100]  In any event, the Debtors did not timely pay the second filing fee installment.

## G.    Mr. Barclay Made Misrepresentations to the Court in Connection with Pay Advices in Multiple Attempts to Have the Main Case Dismissed.

On June 3, 2021, the Chapter 7 Trustee filed a "Notice of Possible Dividends,"[101] which operated to prevent the Main Case from being dismissed for failure to pay filing fees.[102]  Apparently still dissatisfied with the Chapter 7 Trustee's efforts to recover assets for the benefit of creditors, Mr. Barclay engaged in another scheme to try to have the Main Case dismissed by manipulating pay advices.

Section 521(a)(1)(B)(iv) requires that bankruptcy debtors file "copies of all payment advices or other evidence of payment *received* within 60 days before the date of the filing of the petition, by the debtor from any employer of the debtor."  (Emphasis added.)  Since Mr. Barclay filed the Petition on April 16, 2021, the Debtors were supposed to file pay advices received during the period from February 15, 2021 to April 16, 2021.

Early in the Main Case, Mr. Barclay filed the following six pay advices for Mrs. Mennona: (1) pay advice dated February 19, 2021 (for pay period February 8, 2021 to February 14, 2021); (2) pay advice dated March 12, 2021 (for pay period March 1, 2021 to March 7, 2021); (3) pay advice dated March 26, 2021 (for pay period March 15, 2021 to March 21, 2021); (4) pay Advice dated April 2, 2021 (for pay period March 22, 2021 to March 28, 2021); (5) pay Advice dated April 9, 2021 (for pay period March 29, 2021 to April 4, 2021); and (6) pay advice dated April 16, 2021 (for the pay period April 5, 2021 to April 11, 2021).[103]

On June 29, 2021, Mr. Barclay filed "Debtor's Motion to Dismiss Chapter 7 Case" (the "First Motion to Dismiss").[104]  There, he stated:

> Debtor spouse included a final paystub dated April 2, 2021.
> Debtor spouse is paid weekly, but omitted paystubs for April 9,
> and April 16, 2021.  Because the Debtors failed to file all pay
> advices received within 60 days before the filing of the petition,
> their case must be dismissed by operation of law.[105]

Mr. Barclay's representation to the Court was plainly false since (as set forth above) he had in his possession and filed with the Court Mrs. Mennona's pay advices for April 9,

---

[100]    Compl. ¶ 64.
[101]    Compl. ¶ 65; Docket No. 20 in Main Case.
[102]    Compl. ¶¶ 65 and 66.
[103]    Docket No. 9 in Main Case.
[104]    Compl. ¶ 67; Docket No. 33 in Main Case.
[105]    Compl. ¶ 69; Docket No. 33 in Main Case.

2021 and April 16, 2021.[106]  In his Objection to the First Motion to Dismiss, the Chapter 7 Trustee pointed out the obvious error.[107]  However, Mr. Barclay continued to prosecute the First Motion to Dismiss.  The Court was forced to conduct a hearing on the First Motion to Dismiss during which Mr. Barclay initially continued to advocate the false premise regarding Mrs. Mennona's April 9, 2021 and April 16, 2021 pay advices.[108]  Later, Mr. Barclay admitted that he was "wrong" and it was his "mistake."[109]  Mr. Barclay also "admitted that [he had filed] all of Mrs. Mennona's pay advices."[110]  Thus, the Court denied the First Motion to Dismiss in relation to Mrs. Mennona.[111]

Notwithstanding Mr. Barclay's representation in open court that he had filed all of Mrs. Mennona's pay advices with the Court, he promptly advocated the exact opposite position.  Immediately after the Court denied the First Motion to Dismiss, Mr. Barclay asked Mrs. Mennona to send him her pay advices dated February 26, 2021, March 5, 2021, and March 19, 2021.[112]  She did not do so and with good reason: Mrs. Mennona did not receive any pay advices dated February 26, 2021, March 5, 2021, and March 19, 2021, since she did not work during the relevant pay periods.[113]  Mrs. Mennona had informed Mr. Barclay that she had not worked during such periods in an e-mail on the Petition Date.[114]  But, that did not stop Mr. Barclay.

On August 29, 2021, without Mrs. Mennona's authorization, Mr. Barclay filed the "Debtor's Voluntary Motion to Dismiss Chapter 7 Case" (the "Second Motion to Dismiss") asking that Mrs. Mennona's case be dismissed because:

> On further review of the pay stubs submitted to the court, it appears that [Mrs. Mennona] nonetheless failed to submit pay advices received February 26, 2021, March 5, 2021, and March 19, 2021.[115]

The central factual premise of the Second Motion to Dismiss (*i.e.,* that Mrs. Mennona failed to file three pay advices she had received dated February 26, 2021, March 5, 2021, and March 19, 2021) was patently false.  And, Mr. Barclay knew it.  After all, early in the Main Case, Mrs. Mennona had told Mr. Barclay that she had not worked during such periods.  And, in response to Mr. Barclay's inquiry after the denial of the First Motion to Dismiss, Mrs. Mennona had explained that she was not able to provide such pay advices because she never received them.  So, Mr. Barclay apparently just fabricated the facts he hoped would allow him to obtain dismissal of the Main Case.

---

[106]   Compl. ¶ 71; Docket No. 9 in Main Case.
[107]   Compl. ¶ 75; Docket No. 40 in Main Case.
[108]   Compl. ¶ 76 and Ex. 10.
[109]   *Id.*
[110]   Compl. ¶ 77; Docket No. 50 in Main Case.
[111]   Docket No. 50 in Main Case.
[112]   Compl. ¶ 78 and Ex. 6.
[113]   Compl. ¶¶ 79 and 81-82 and Ex. 11.
[114]   Compl. ¶ 82 and Ex. 11.
[115]   Compl. ¶ 80; Docket No. 57 in Main Case.

The Chapter 7 Trustee objected to the Second Motion to Dismiss.[116]  Thereafter, Mrs. Mennona again informed Mr. Barclay that she had not received the supposedly missing pay advices.[117]  Even then, Mr. Barclay declined to withdraw the Second Motion to Dismiss and never informed the Court that his factual representations in the Second Motion to Dismiss were false.[118]

**H.      Mr. Barclay Caused the Debtors to Be Sanctioned for His Own Egregious Discovery Misconduct and Encouraged Harm to Counsel for the Chapter 7 Trustee.**

Throughout the pendency of the Main Case, the Chapter 7 Trustee repeatedly tried to obtain documents from the Debtors to assess the Debtors' financial condition and administer the Main Case for the benefit of creditors and other parties in interest.[119]  Mr. Barclay consistently stymied such efforts by failing to timely advise the Debtors about the Chapter 7 Trustee's requests.[120]

Initially, the Chapter 7 Trustee made a series of informal requests for information from the Debtors on May 13, 2021, May 17, 2021, and June 4, 2021.[121]  Two of the requests were made in writing to Mr. Barclay.[122]  The other was made orally to Mr. Barclay at the Section 341 meeting of creditors (which Barclay had advised the Debtors not to attend).[123]  Mr. Barclay did not apprise the Debtors of any of the informal requests for information made by the Chapter 7 Trustee.[124]  And, Mr. Barclay did not respond to the Chapter 7 Trustee either.[125]

Given Mr. Barclay's intransigence, the Chapter 7 Trustee turned to a formal discovery mechanism and filed a "Motion to Compel Turnover of Property of the Estate" (the "Motion to Compel").[126]  In the Motion to Compel, the Chapter 7 Trustee requested that the Debtors turn over to the Chapter 7 Trustee keys and access to their real property as well as six categories of documents.[127]  Mr. Barclay did not inform the Debtors about the Motion to Compel and he did not ask the Debtors to provide access to their real property or to provide information responsive to the Motion to Compel.[128]  Instead, Mr. Barclay filed an unauthorized objection to the Motion to Compel which contained no legal or factual basis for denial of the Motion to Compel.[129]  Thereafter, the Court set a hearing

---

[116]      Compl. ¶ 83; Docket No. 67 in Main Case.
[117]      Compl. ¶ 84.
[118]      Compl. ¶ 86.  The Second Motion to Dismiss ultimately was withdrawn by Substitute Counsel for the Debtors.  Docket No. 137 in Main Case.
[119]      Compl. ¶ 87.
[120]      Compl. ¶ 88.
[121]      Compl. ¶¶ 89-97 and Ex. 12 and 13.
[122]      Compl. ¶¶ 89 and 94 and Ex. 12 and 13.
[123]      Compl. ¶ 92.
[124]      Compl. ¶¶ 91, 93 and 96.
[125]      Compl. ¶¶ 90 and 95.
[126]      Compl. ¶ 98; Docket No. 27 in Main Case.
[127]      *Id*.
[128]      Compl. ¶ 100-101.
[129]      Compl. ¶ 99; Docket No. 35 in Main Case

on the Motion to Compel.  Mr. Barclay did not inform the Debtors about the hearing.[130]  At the hearing, the Court entered an "Order Granting Motion by Trustee to Compel Turnover of Property of the Estate" (the "Turnover Order") and directed that the Debtors to provide access to their real property and produce all the documents requested by the Chapter 7 Trustee within seven days.[131]  Just as he failed to disclose the Motion to Compel to the Debtors, Mr. Barclay also did not inform the Debtors about the Turnover Order and their obligations thereunder.[132]  As a consequence of Mr. Barclay's actions and failure to communicate with his clients, the Debtors did not comply with the Turnover Order.[133]

Since the Debtors did not comply with the Turnover Order (after all, they were unaware of it), the Chapter 7 Trustee was forced to file a motion to enforce the Turnover Order.[134]  Thereafter, the Court issued an "Order to Debtors to Show Cause Why Sanctions for Civil Contempt Should Not Be Imposed" (the "Main Case Order to Show Cause.").[135]  On the verge of contempt, Mr. Barclay finally asked the Debtors to send him some of the materials required by the Turnover Order.  But that was not all — he also encouraged the Debtors to harm counsel for the Chapter 7 Trustee.  Bizarrely, this is what Mr. Barclay advised his clients to do before mailing documents to the Chapter 7 Trustee's counsel:

> If either of you have COVID or some other highly infectious, nasty disease — or if you know someone who does — please make sure they lick the envelope and handle it as much as possible.[136]

Next, Mr. Barclay lied to the Court.  In his "Response to Order to Show Cause," Mr. Barclay told the Court that the "Debtors have provided the trustee with most of the items requested in their motion for turnover" and that the "Debtors have essentially complied [with the Turnover Order] . . . ."[137]  But that was another blatant untruth.  When Mr. Barclay made the foregoing misrepresentation, the Debtors had only provided two categories of documents requested by the Chapter 7 Trustee.[138]  At the initial hearing on the Main Case Order to Show Cause, Mr. Barclay again continued the charade about having fully complied with the Turnover Order.[139]  The Chapter 7 Trustee contested such assertion.  So, the Court set a contested evidentiary hearing to get to the bottom of the dispute.[140]  Two days before the hearing, Mr. Barclay agreed to "Stipulated Facts" acknowledging that the Debtors had not turned over anything by the deadline set in the Turnover Order and had not turned over all the required information by the initial hearing

---

[130]    Compl. ¶ 101.
[131]    Compl. ¶ 103; Docket No. 51 in Main Case.
[132]    Compl. ¶¶ 104-105.
[133]    Compl. ¶ 104-106.
[134]    Compl. ¶ 107; Docket No. 62 in Main Case.
[135]    Compl. ¶ 111; Docket No. 63 in Main Case.
[136]    Compl. ¶¶ 112-113 and Ex. 15.
[137]    Compl. ¶ 114; Docket No. 65 in Main Case.
[138]    Compl. ¶¶ 115, 167 and 168.
[139]    Compl. ¶ 116.
[140]    *Id.*

on the Main Case Order to Show Cause.[141]  So, Mr. Barclay no longer contested the facts.  At the evidentiary hearing on the Main Case Order to Show Cause, Mr. Barclay and the Debtors did not present any evidence.  The Court held the Debtors in contempt of Court and imposed a $2,783.50 monetary sanction on the Debtors for failure to timely comply with the Turnover Order.[142]  At that stage, the Court had little idea of the extent of Mr. Barclay's misconduct and assumed that the Debtors had failed to comply.  But after the award of sanctions, Mr. Barclay took some responsibility stating that a "good part of the blame" rested with him and indicating that he would pay the sanctions.[143]

## I.   **Mr. Barclay Attempted to Commit a Fraud on the Court Through Another Misguided Dismissal Effort.**

Meanwhile, on the morning after the initial hearing on the Main Case Order to Show Cause, Mr. Barclay engaged in a new effort to defraud the Court using a section of the Bankruptcy Code designed to encourage debtor cooperation with creditors: Section 521(e)(2)(C).[144]  Mr. Barclay sent an e-mail to an employee of one of the Debtors' creditors:  BC Services.  The e-mail proposed a convoluted multi-stage scheme to dismiss the Main Case and pay BC Services in preference to the Debtors' other creditors and to "compensate BC Services for its time and cooperation in this process."  This is exactly what Mr. Barclay wrote to BC Services (the "BC Services E-Mail"):

> Hi Amy,
>
> I'm writing to request a bit of a favor.
>
> I've got an active Ch 7 that has gone completely off the rails.  Essentially, the trustee is actively trying to extort my clients.  I believe I can get the case dismissed on statutory grounds, but it's a very open question.  Should that fail, we'll be left in a very protracted appeals process.  We are prepared to do that, but for obvious reasons would prefer not to.
>
> In the event that we win, which I think we will, BC Services will receive nothing – but, I'd prefer to see your client get paid, and I'd much prefer not to wait until mid-October to resolve those issues at trial.  Instead, what I'd like is for BC Services to request a copy of my clients [sic] tax returns, and we will willfully not comply with that request.  In response, BC

---

[141]   Compl. ¶¶ 117-118; Docket No. 78 in Main Case.
[142]   Compl. ¶ 120; Docket No. 85 in Main Case.
[143]   Compl. ¶ 121.
[144]   Section 521(e)(2)(C) provides the opportunity for a creditor to request a copy of the debtor's Federal income tax return "for the most recent tax year ending immediately before the commencement of the case and for which a Federal income tax return was filed."  11 U.S.C. § 521(e)(2)(C).  If the debtor fails to comply with the request, "the court shall dismiss the case unless the debtor demonstrates circumstances beyond the control of the debtor."  *Id.*

Services would file a motion for dismissal of the case
on statutory grounds.

We will prepare a draft of the motion for your use, and in
exchange for all of this we will pay anything owed to BC
Services in full and compensate BC Services for its time and
cooperation in this process.

Please let me know if this is of interest. I think it's a good deal
for both BC Services and my clients.

Cheers,

Devon[145]

So to restate, Mr. Barclay tried to convince BC Services to make a request for the
Debtors' tax returns.  Then, even though Mr. Barclay had the Debtors' tax returns, he
planned to engage in a complete farce: "we will willfully not comply with that request."[146]
Next, Mr. Barclay asked BC Services to file a motion to dismiss based upon Mr. Barclay's
own willful non-compliance.  Mr. Barclay proposed to ghost-write the motion to dismiss
himself so the Court would not know about the scheme.  Then, Mr. Barclay committed to
pay BC Services for helping to engage in the fraud.

To its credit, BC Services declined to engage in the scheme.  Instead, BC Services
sent a copy of the BC Services E-Mail to the Chapter 7 Trustee.[147]  At that point, Mr.
Barclay began dissembling.  He asserted that the BC Services E-Mail was "privileged in
nature and content" and a "confidential settlement offer."[148]  Those statements were
obviously false.  Then, he claimed that his intent was "to be completely transparent with
the court regarding the circumstances giving rise to the motion [to dismiss] . . . ."  Mr.
Barclay's assertion is preposterous on its face.

The foregoing scheme was concocted solely by Mr. Barclay.  The Debtors did not
authorize Mr. Barclay to make the illicit proposal to BC Services.[149]  They had no
knowledge about the matter until after the Chapter 7 Trustee disclosed the BC Services
E-Mail to the Chapter 7 Trustee and it was read in open court at the second hearing on
the Main Case Order to Show Cause.[150]  The Debtors were "appalled" by Mr. Barclay's
misconduct which they recognized immediately for what it was: "fraudulent activity."[151]

---

[145]   Compl. ¶ 122 and Ex. 16, at 5.
[146]   Compl. ¶¶ 122 and 131.
[147]   Compl. ¶ 123.
[148]   Compl. ¶ 124.
[149]   Compl. ¶ 128 and Ex. 1 at 100-109.
[150]   Compl. ¶¶ 126-129.
[151]   Compl. ¶ 130 and Ex. 1 at 100-109.

**J.**     **The Debtors Engaged New Legal Counsel.**

Within weeks of the entry of sanctions against the Debtors and the disclosure of the BC Services E-Mail, the Debtors fired the Defendants and retained Substitute Counsel.[152]  Substitute Counsel withdrew the Second Motion to Dismiss.[153]  Substitute Counsel also facilitated the Debtors' testimony at the Section 341 meeting of creditors.[154]  And, not long thereafter, the Debtors were able to secure their bankruptcy discharge.[155]

## V.     Legal Conclusions.

In the Complaint, the UST stated five causes of action against the Defendants as follows: (1) violations of Fed. R. Bank. P. 1008 and 9011; (2) violations of Section 526(a)(2); (3) violations of Sections 526(a)(1) and (a)(3); (4) violations of Section 528; and (5) violations of professional duties.  The Court analyzes each of the causes of action separately.

**A.**     **The Defendants Violated Fed. R. Bankr. P. 1008 and 9011(b) and (f).**

In his First Cause of Action, the UST asserts that the Defendants violated Fed. R. Bankr. P. 1008 and 9011 by filing the Petition without the Debtors' signatures.  A rather obvious preliminary step in bankruptcy practice is that "an attorney needs to know for certain that his client wishes to file for bankruptcy before a petition is filed." *Briggs v. Labarge (In re Phillips)*, 433 F.3d 1068, 1071 (8th Cir. 2006).  Fed. R. Bankr. P. 1008 embodies that premise and mandates:

> All petitions, lists, schedules, statements and amendments thereto shall be verified or contain a sworn declaration as provided in 28 U.S.C. § 1746.

The signature requirement found in Fed. R. Bankr. P. 1008 is "a means of not only authorizing the filing of those documents, but of verifying, under penalty of perjury, that they [the debtors] have reviewed the information contained therein and that it is true and correct to the best of their knowledge, information and belief." *In re Bradley*, 495 B.R. 747, 760 (Bankr. S.D. Tex.  2013); *see also In re Dobbs*, 535 B.R. 675, 685 (Bankr. N.D. Miss. 2015) ("under [Fed. R. Bankr. P.] 1008 — 'any attorney who files schedules and statements on a debtor's behalf makes a certification [of accuracy] regarding the representations contained therein.'").  There are "no circumstances that would ever justify an attorney filing a petition, any Schedule, or a SOFA [statement of financial affairs] without first obtaining the debtor's signature . . . ." *Bradley*, 495 B.R. at 780.  Fed. R. Bankr. P. 9011(f) reenforces the Fed. R. Bankr. P. 1008 signature requirement and provides: "[w]hen these rules require copies of a signed or verified paper, it shall suffice if the original is signed or verified and the copies are conformed to the original." *See also* Fed. R. Bankr. P. 9011(b)(3) ("By presenting to the court (whether by signing [or] filing. . .)

---

[152]     Compl. ¶ 132.
[153]     Compl. ¶ 133; Docket Nos. 136 and 137 in Main Case.
[154]     Compl. ¶ 134.
[155]     Compl. ¶ 135; Docket No. 142 in Main Case.

a petition . . . , an attorney . . . is certifying that . . . . the allegations and other factual contentions have evidentiary support . . . .").  And, of course, Official Form 101 (Voluntary Petition for Individuals Filing for Bankruptcy) requires that debtors must sign their petitions under penalty of perjury.  The need for an attorney to receive and retain a bankruptcy debtor's actual "wet signature" on a petition is also mandated by this Court's local rules, which require: "Documents required to be retained by attorneys with actual signatures of the debtor include all petitions, statements, schedules, lists, and amendments thereto." L.B.R. 9011-4; see also L.B.R. 5005-4(a)(5) (same).

Nowadays, most bankruptcy petitions and associated documents are filed with the Court electronically.  But the mechanics of filing electronically really make no difference. "In filing a petition electronically, the practitioner represents to the court that he or she has secured an originally executed petition physically signed by debtor *prior* to electronically filing the case." *In re Wenk*, 296 B.R. 719, 724 (Bankr. E.D. Va. 2002) (emphasis in original); *Dobbs*, 535 B.R. at 686 (same).  Bankruptcy courts uniformly have determined that "electronically filing a document bearing an electronic signature that was not actually or validly signed constitutes a forgery amounting to a Rule 9011 violation."  *In re Stomberg*, 487 B.R. 775, 808 (Bankr. S.D. Tex.  2013) (quotation omitted); *see also Briggs v. Labarage (In re Phillips)*, 317 B.R. 518, 524 (8th Cir. BAP 2004), *aff'd in part* 433 F.3d 1068 (8th Cir. 2006) (finding that without the original signature on the debtor's petition "the factual contentions have no evidentiary support and thus the petition violates Rule 9011(b)(3)."); *In re Burnett*, 2022 WL 802586, at *8 (Bankr. D.S.C. Mar. 16, 2022) ("The filing of a document with the debtor's electronic signature is a certification by an attorney that he has appropriately obtained the signature."); *In re T.H.*, 529 B.R. 112, 139-141 (Bankr. E.D. Va. 2015) (finding that attorney violated Fed. R. Bankr. P. 9011 by filing a petition without the debtor's signature and stating that "[a]ffixing the electronic signature of an individual who did not in fact sign or authorize the signing indeed amounts to forgery"); *Bradley*, 495 B.R. at 780 ("electronically filing a document that purports to have the debtor's signature, but which was not, in fact, signed by the debtor is no different than physically forging the debtor's signature on a paper document."); *U.S. Tr. v. Jones (In re Alvarado)*, 363 B.R. 484, 491 (Bankr. E.D. Va. 2007) (finding Rule 9011 was violated where attorney filed a second case without debtor's signature); *In re Ludwick*, 185 B.R. 238, 244-47 (Bankr. W.D. Mich. 1995) (suspending attorney for forging client signatures in violation of Fed. R. Bankr. P. 9011).

The requirement that every bankruptcy debtor sign his or her petition *before* the petition is filed is not some mere make-work bureaucratic rule.  Instead, it is fundamental to the operation of the bankruptcy system.  It is the pivotal first step to everything that follows.  Mr. Barclay's violation of Fed. R. Civ. P. 1008 and 9011(b) and (f) is patent.  He admitted (and his clients have confirmed) that he did not obtain the Debtors' signatures before filing the Petition with the Court.  Instead, on the Petition Date, the Debtors were still in the process of reviewing the accuracy of the Petition, Statement of Financial Affairs, and Schedules.  Mr. Barclay filed the Petition anyway — without final authorization from the Debtors in the form of their signatures on the Petition.  Mr. Barclay forged the Debtors signatures on the Petition.  His misconduct is attributable to his wholly-owned law firm (DBPC) too.

In the First Cause of Action, the UST focuses exclusively on Mr. Barclay's improper filing of the Petition to commence the Main Case.  That is certainly important.  However, the Court notes that Mr. Barclay also forged the Debtors' signatures on the Debtors' Statement of Financial Affairs and the Declaration for the Debtor's Schedules.  As with the Petition, the purported signatures of the Debtors affixed to the Statement of Financial Affairs and Declaration for the Debtor's Schedules were submitted on forms indicating that the Debtors were subject to potential penalty of perjury for false submissions.  But the Debtors had not approved and authorized the final filing of such documents.  Mr. Barclay's forgery of the Debtors' signatures on the Debtors' Statement of Financial Affairs and the Declaration for the Debtor's Schedules likely would support further claims by the UST against the Defendants for malfeasance pursuant to Fed. R. Bankr. P. 1008 and 9011(b) and (f).

**B.    The Defendants Violated Section 526(a)(2).**

In his Second Cause of Action, the UST asserts that the Defendants violated Section 526(a)(2).  Congress enacted Section 526 to strengthen professionalism standards for attorneys and others who assist consumer debtors in their bankruptcy cases.  *Milavetz, Gallop & Milavetz, P.A. v. U.S.,* 559 U.S. 229, 232 (2010).  Section 526(a)(2) states:

> A debt relief agency shall not — (2) make any statement, or counsel or advise any assisted person or prospective assisted person to make a statement in a document filed in a case or proceeding under this title, that is untrue or misleading, or that upon the exercise of reasonable care, should have been known by such agency to be untrue or misleading . . . .

Interpretation of Section 526(a)(2) requires quite a bit of statutory cross-referencing.  The phrase "debt relief agency" in Section 526(a)(2) is defined as:

> . . . any person who provides any bankruptcy assistance to an assisted person in return for the payment of money or other valuable consideration.

11 U.S.C. § 101(12A).  The term "bankruptcy assistance" is quite broad and means:

> . . . any goods or services sold or otherwise provided to an assisted person with the express or implied purpose of providing information, advice, counsel, document preparation, or filing, or attendance at a creditor's meeting or appearing in a case or proceeding on behalf of another or providing legal representation with respect to a case or proceeding under this title.

11 U.S.C. § 101(4A).  The phrase "assisted person" in Section 526(a)(2) is:

> Any person whose debts consist primarily of consumer debts
> and the value of whose nonexempt property is less than
> $204,425.[156]

11 U.S.C. § 101(3).  "Consumer debts" are those "incurred by an individual primarily for a personal, family, or household purpose."  11 U.S.C. § 101(8).

Putting it all together in the context of this Adversary Proceeding, as a threshold, Section 526(a)(2) only applies if the Defendants qualify as "debt relief agenc[ies]" and the Debtors are "assisted person[s]" who received "bankruptcy assistance" from the Defendants.  Fortunately, these elements are easily met because the Defendants twice affirmatively admitted the points.  In the Answer, the Defendants conceded that "Barclay acted as a debt relief agency in relation to the Debtor's Case" and "[t]he Debtors are 'assisted persons' and received 'bankruptcy assistance' from Barclay."[157]  In the Stipulated Facts, the Defendants admitted:

> The Defendants acted as 'debt relief agencies,' as that term is
> defined by 11 U.S.C. § 101(12A), in relation to the Debtors'
> bankruptcy case.  The Debtors are 'assisted persons' and
> received 'bankruptcy assistance' from the Defendants, as
> those terms are defined by 11 U.S.C. §§ 101(3) and 101(4A)
> respectively.[158]

In addition to twice affirmatively agreeing that the Defendants qualify as "debt relief agenc[ies]" and the Debtors are "assisted persons" who received "bankruptcy assistance" from the Defendants, the Defendants later withdrew the Answer and defaulted.  Per the default, the Defendants conceded again that "Barclay acted as a debt relief agency in relation to the Debtor's case" and "[t]he Debtors are 'assisted persons' and received 'bankruptcy assistance' from Barclay."[159]

Having concluded that the Defendants acted as "debt relief agenc[ies]" and that the Debtors were "assisted persons" who received "bankruptcy assistance" from the Defendants, the only thing that remains to be analyzed with respect to the Second Cause of Action is whether Mr. Barclay made "any statement . . . that is untrue or misleading."  For purposes of brevity, the Court considers only documents Mr. Barclay filed in the Main

---

[156]    The dollar amount cap on the value of a debtor's nonexempt property in Section 101(3) increased from $204,425 to $226,850, effective April 1, 2022.  However, since the Main Case was filed on April 16, 2021, the lower amount applies.

[157]    Compl. ¶¶ 158 and 159; Answer ¶¶ 158 and 159.  In a seminal decision construing Section 526(a), the Supreme Court determined that "the statutory text clearly indicates that attorneys [and their law firms] are debt relief agencies when they provide qualifying services to assisted persons."  *Milavetz, Gallop & Milavetz, P.A.*, 559 U.S. at 239 (holding that Section 526 applied to both individual attorney and law firm).

[158]    Stip. Facts ¶ 5.

[159]    Compl. ¶¶ 158 and 159.  Given these admissions by the Defendants, the Court need not independently analyze whether the value of the Debtors' nonexempt property fell under the Section 101(3) monetary threshold for purposes of determining whether the Debtors were "assisted persons" protected by Section 526(a).

Case.[160]  Mr. Barclay made at least the following statements that were untrue or misleading in documents filed in the Main Case:

- Mr. Barclay falsely stated that the Debtors had signed the Petition (by forging their signatures on the Petition) even through the Debtors had not signed the Petition;

- Mr. Barclay falsely stated that the Debtors had signed the Statement of Financial Affairs (by forging their signatures on the Statement of Financial Affairs) even through the Debtors had not signed the Statement of Financial Affairs;

- Mr. Barclay falsely stated that the Debtors had signed the Declaration (by forging their signatures on the Declaration) even through the Debtors had not signed the Declaration;

- Mr. Barclay falsely stated the amount of cash in the Debtors' bank accounts on the Debtors' Schedule A/B even though he had been advised concerning the correct amounts;

- Mr. Barclay falsely stated that the Debtors had signed the Filing Fee Application (by forging their signatures on the Filing Fee Application) even through the Debtors had not signed the Filing Fee Application;

- Mr. Barclay falsely stated that the Debtors were "unable to pay the full filing fee at once" even though he knew that the Debtors had more than sufficient funds to pay the full filing fee on the Petition Date;

- Mr. Barclay falsely stated in the First Motion to Dismiss that Mrs. Mennona had "omitted paystubs for April 9 and April 16, 2021" even though Mrs. Mennona had filed such paystubs;

- Mr. Barclay falsely stated in the Second Motion to Dismiss that Mrs. Mennona had failed to file three pay advices she had received (dated February 26, 2021, March 5, 2021, and March 19, 2021) even though Mrs. Mennona did not work during such periods and therefore had not received the allegedly missing pay advices; and

---

[160]   The statutory text of Section 526(a)(2) does not appear to be limited to documents filed in a bankruptcy case and could also cover Barclay's oral statements to the Court as well as in the Section 341 meeting.  *See, e.g., Bisges v. Gargula (In re Clink)*, 770 F.3d 719, 723 (8th Cir. 2014) (holding that Section 526(a)(2) applies to counseling activities even if no document is filed in court).  However, given the volume of "untrue or misleading" statements made by Barclay in documents filed in the Main Case, there is no need to pile on.

- Mr. Barclay falsely asserted in a "Response to Order to Show Cause" that the Debtors "have provided the trustee with most of the items" listed in the Turnover Order even though the Debtors had not.[161]

So, Mr. Barclay violated Section 526(a)(2) and his misconduct is imputed to his law firm.

## C.   The Defendants Violated Sections 526(a)(1) and (a)(3).

In his Third Cause of Action, the UST asserts that the Defendants violated Sections 526(a)(1) and (a)(3) which state:

A debt relief agency shall not —

(1)   fail to perform any service that such agency informed an assisted person or prospective assisted person it would provide in connection with a case or proceeding under this title; [and]

. . . .

(3)   misrepresent to any assisted person or prospective assisted person, directly or indirectly, affirmatively or by material omission, with respect to —

(A)   the services that such agency will provide to such person; or

(B)   the benefits and risks that may result if such person becomes a debtor in a case under this title . . . .

Sections 526(a)(1) and (a)(3) use much of the same terminology applicable in Section 526(a)(2). So, the Court's prior discussion about the meaning of the phrases "debt relief agency," "assisted person," "consumer debts," and "bankruptcy assistance" applies equally to the UST's Third Cause of Action. *See* 11 U.S.C. §§ 101(3), (4A), (8), and (12A). The Court already has determined that the Defendants are "debt relief agenc[ies]" that provided "bankruptcy assistance" to the Debtors who themselves are "assisted persons."

So, all that remains for the Court to do is decide whether the Defendants violated the substantive provisions of Sections 526(a)(1) and (a)(3). With respect to Section 526(a)(1), the Defendants never executed any sort of written agreement with the Debtors. However, Mr. Barclay did circulate an unexecuted form of draft Representation Agreement to the Debtors. The draft Representation Agreement listed the services that the Defendants proposed to provide:

---

[161]   Barclay has admitted all of the foregoing. Compl. ¶¶ 160-168.

> . . . preparing and filing a bankruptcy petition, attending the
> meeting of creditors, dealing with creditor phone calls and
> collection attempts, and responding to up to fifty inbound client
> phone calls regarding this bankruptcy case.  It also includes
> assisting the client with any requests from the bankruptcy
> trustee as part of the administration of the case and working
> on the resolution of any issues.[162]

Even though Mr. Barclay did not sign the Representation Agreement, the Court finds that the Defendants purported to represent the Debtors pursuant to the terms (albeit incomplete) of the Representation Agreement.  That is, they committed to do at least the foregoing.

However, the Defendants violated Section 526(a)(1) because they did not do what they promised in the Representation Agreement.  Among other things, Mr. Barclay: (1) failed to attend the rescheduled Section 341 meeting of creditors; and (2) failed to assist the Debtors with requests for information from the Chapter 7 Trustee.  Mr. Barclay also did not inform the Debtors about the informal requests for information received from the Chapter 7 Trustee.  He did not tell the Debtors about the Motion to Compel and failed to timely advise them regarding the Turnover Order too.  Rather than assist the Debtors, Mr. Barclay's actions resulted in the Court holding the Debtors in contempt and sanctioning them.  The same conduct violative of Section 526(a)(1) also establishes a violation of Section 526(a)(3) because the Defendants misrepresented the bankruptcy legal services which they promised to provide.

## D.  The Defendants Violated Section 528(a).

In his Fourth Cause of Action, the UST asserts that the Defendants violated Section 528(a).  Section 528(a) states:

> A debt relief agency shall —
>
> (1)  not later than 5 business days after the first date on
>       which such agency provides any bankruptcy assistance
>       services to an assisted person, but prior to such
>       assisted person's petition under this title being filed,
>       execute a written contract with such assisted person
>       that explains clearly and conspicuously —
>
>       (A)  the services such agency will provide to such
>             assisted person; and
>
>       (B)  the fees or charges for such services, and the
>             terms of payment;

---

[162]    Compl. ¶172 and Ex. 2.

> (2)     provide the assisted person with a copy of the fully
>          executed and completed contract . . . .

Section 528 uses much of the same terminology applicable in Section 526(a).  So, the Court's prior discussion about the meaning of the phrases "debt relief agency," "assisted person," "consumer debts," and "bankruptcy assistance" applies equally to the UST's Fourth Cause of Action.  *See* 11 U.S.C. §§ 101(3), (4A), (8), and (12A).  The Court already has determined that the Defendants are "debt relief agenc[ies]" that provided "bankruptcy assistance" to the Debtors who themselves are "assisted persons."

The facts prove that the Defendants violated Section 528(a).  The Defendants did not provide the Debtors with an executed written contract within five days after Mr. Barclay first started advising the Debtors about bankruptcy issues in October 2020.  Indeed, the Defendants never executed a written contract at all.  And, so, it follows that the Defendants did not provide the Debtors with a copy of the non-existent executed written contract.  The closest the Defendants came to complying with Section 528(a) was circulating a draft Representation Agreement to the Debtors.  But neither Mr. Barclay nor the Debtors signed the draft Representation Agreement.  Moreover, the draft Representation Agreement itself was missing critical information such as "the fees or charges for such services."  Accordingly, the Defendants obviously violated Section 528(a).

## E.     Mr. Barclay Violated Professional Duties and Committed Bad Faith Litigation Misconduct.

In his Fifth Cause of Action, the UST asserts that Mr. Barclay violated a multitude of professional duties owing to the Debtors, the Court, and others, including under the Colorado Rules of Professional Conduct.  Although the First, Second, Third, and Fourth Causes of Action capture some discrete components of Barclay's misconduct in the Main Case, the Fifth Cause of Action paints a much broader picture of intentional gross malfeasance and abuse of the bankruptcy system.

Every federal court has the inherent power "to control admission to its bar and to discipline attorneys who appear before it."  *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991).  *See also In re Snyder*, 472 U.S. 634, 643 (1985) ("Courts have long recognized an inherent authority to suspend or disbar lawyers . . . .  This inherent power derives from the lawyer's role as an officer of the court which granted admission."); *Ex Parte Wall,* 107 U.S. 265, 273 (1883) ("a court has power to exercise a summary jurisdiction over its attorneys to compel them to act honestly towards their clients, and to punish them . . . for misconduct and contempts, and, in gross cases of misconduct, to strike their names from the roll [of attorneys].").

The inherent power of a federal court to "control admission to its bar and discipline attorneys" is not displaced by statutes (such as Sections 526(a) and 528(a)) or procedural rules (such as Fed. R. Bankr. P. 9011) governing abusive lawyer conduct.  Instead, such inherent power "extends to a full range of litigation abuses" and "must continue to exist to fill in the interstices" between statutes and rules.  *Chambers*, 501 U.S. at 46 ("the inherent

power of a court can be invoked even if procedural rules [*e.g.,* Fed. R. Civ. P. 11] exist which sanction the same conduct.").  Put another way:

> . . . when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power.  But if in the informed discretion of the court, neither the statute nor the Rules are up to the task, the court may safely rely on its inherent power.

*Id*. at 50.

The inherent power to sanction attorneys for misconduct extends fully to bankruptcy courts.  *Chambers*, 501 U.S. at 43 (inherent power to discipline attorneys is "incidental to all Courts").  Indeed, "overseeing lawyers who represent bankruptcy debtors" is one of the "core and traditional role[s]" of bankruptcy judges.  *Stewart*, 970 F.3d at 1258 (citing 3 R. Levin & H. Sommer, COLLIER ON BANKRUPTCY ¶ 329, at 329–34 (16th ed. 2020)).

In its seminal decision on the topic, *Jones v. Bank of Santa Fe (In re Courtesy Inns Ltd., Inc.)*, 40 F.3d 1084 (10th Cir. 1994), the Tenth Circuit Court of Appeals identified Section 105(a) as a cornerstone authorizing bankruptcy courts to exercise inherent powers to control attorney misconduct.  Section 105(a) provides:

> The court may issue any order . . . necessary or appropriate to carry out the provisions of this title.  No provision of this title . . . shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate . . . to prevent an abuse of process.

The Tenth Circuit Court of Appeals explained that Section 105(a) is "intended to imbue the bankruptcy courts with the inherent power recognized by the Supreme Court in *Chambers.*"  *Courtesy Inns*, 40 F.3d at 1089 ("The power to maintain order and confine improper behavior in its own [bankruptcy] proceedings seems a necessary adjunct to any tribunal charged by law with the adjudication of disputes.").  Other appellate courts are in accord.  *Ginsberg v. Evergreen Sec., Ltd. (In re Evergreen Sec., Ltd.),* 570 F.3d 1257, 1263 (11th Cir. 2009) (recognizing that bankruptcy courts have inherent power to impose attorney sanctions); *Price v. Lehtinen (In re Lehtinen)*, 564 F.3d 1052, 1058 (9th Cir. 2009) (same); *Knight v. Luedtke (In re Yorkshire, LLC),* 540 F.3d 328, 332 (5th Cir. 2008) (same); *Mapother & Mapother, P.S.C. v. Cooper (In re Downs)*, 103 F.3d 472, 477 (6th Cir. 1996) (same).

Overseeing the conduct of bankruptcy lawyers is critical to protect the interests of bankruptcy debtors and the entire bankruptcy system.  *See Young v. Young (In re Young)*, 789 F.3d 872, 879 (8th Cir. 2015) (quoting *In re Armstrong*, 487 B.R. 764, 774 (E.D. Tex. 2012)) ("The potential for mischief to be caused by an attorney who is willing to skirt ethical obligations and procedural rules [in bankruptcy cases] is enormous."); *Dobbs*,

535 B.R. at 698 ("Courts must uphold the dignity of the legal profession, and need to protect the public from any attorney misconduct.").  In *Dignity Health v. Seare (In re Seare),* 493 B.R. 158 (Bankr. D. Nev. 2013) *aff'd* 515 B.R. 599 (9th Cir. BAP 2014), the court succinctly explained why bankruptcy courts must protect against abuse of process by bankruptcy attorneys:

> [L]awyers should behave with honesty and integrity.  Being able to trust lawyers to protect one's property is especially important for consumer bankruptcy debtors, who typically seek representation in dire circumstances and face a complex legal process.  The system is harmed where lawyers create or use false evidence or intend to deceive the court, and where the lawyer's behavior puts an unreasonable burden on the court.  The profession is harmed where an attorney's practices reflect poorly on the profession or contribute to a decline in the overall quality of services provided by attorneys in a practice area or region.

*Id.* at 220 (citing AM. BAR ASS'N, JT. COMM. ON PROF'L SANCTIONS, STANDARDS FOR IMPOSING LAWYER SANCTIONS 13 (2005)).

In exercising inherent powers to control attorney misconduct, a bankruptcy judge should consider the rules governing the professional conduct of lawyers practicing in bankruptcy court.  *Parker v. Jacobs,* 466 B.R. 542, 548-50 (M.D. Ala. 2012), *aff'd sub nom. In re Parker,* 485 F. App'x 989 (11th Cir. 2012); *Dobbs,* 535 B.R. at 689 ("[W]hen considering attorney misconduct and Rule 9011 violations, a bankruptcy court may also take into consideration the Rules of Professional Conduct of the state in which the court sits."); *In re Santos,* 616 B.R. 332, 353 (Bankr. N.D. Tex. 2020) (same); *Seare,* 493 B.R. at 215-16 (retainer agreement executed without compliance with the communication and consultation rules found in Nevada's rules of professional conduct violated Section 528(a)).

In this jurisdiction, Local Bankruptcy Rule 9010-1(a) states that the "Local Rules of Practice of the United States District Court for the District of Colorado, Section V – Attorney Rules will apply" to the practice of law before the Bankruptcy Court.  The Local Rules of Practice of the District of Colorado, Section V, provide, with exceptions not applicable here, that "the Colorado Rules of Professional Conduct (Colo. RPC) are adopted as standards of professional responsibility for the United States District Court and the United States Bankruptcy Court for the District of Colorado." D.C. Colo.L.Atty.R. 2(a).

As set forth below, Mr. Barclay violated multiple provisions of the Colorado Rules of Professional Conduct ("Colo. RPC"), including Colo. RPC 8.4, Colo. RPC 4.1, Colo. RPC 1.1, Colo. RPC 3.3, and Colo. RPC 1.4., in his representation of the Debtors in the Main Case.  Mr. Barclay's misconduct was intentional and done in bad faith.  He harmed the Debtors, interfered with the efficient administration of the Main Case, misled the Court, and egregiously abused the bankruptcy system.

1.    **Mr. Barclay Violated Colo. RPC 8.4.**

Colo. RPC 8.4 is directed to "professional misconduct" and states:

> It is professional misconduct for a lawyer to:
>
> (a)    violate or attempt to violate the Rules of Professional Conduct, knowingly assist or induce another to do so, or do so through the acts of another;
>
> . . . .
>
> (c)    engage in conduct involving dishonesty, fraud, deceit or misrepresentation . . . ;
>
> (d)    engage in conduct that is prejudicial to the administration of justice; [or]
>
> . . . .
>
> (h) engage in any conduct that directly, intentionally, and wrongfully harms others and that adversely reflects on a lawyer's fitness to practice law[.]

The same misconduct proved with respect to the First, Second, Third, and Fourth Causes of Action establishes that Mr. Barclay violated Colo. RCP 8.4. He forged the Debtors' signatures on the Petition, the Statement of Financial Affairs, Declaration for the Debtors' Schedules, and the Filing Fee Application. He submitted a knowingly incorrect Schedule A/B. He falsely asserted that the Debtors could not pay the bankruptcy filing fee when he knew otherwise. He made false statements in documents filed with the Court including the First Motion to Dismiss, the Second Motion to Dismiss, and the "Response to Order to Show Cause." All of such conduct constitutes dishonesty, fraud, deceit, and misrepresentation. Mr. Barclay's malfeasance harmed the Debtors and was prejudicial to the administration of justice. *See In re Husain*, 533 B.R. 658, 696-98 (Bankr. N.D. Ill. 2015) *aff'd* 866 F.3d 832 (7th Cir. 2017) (counsel who falsely represented that clients had signed bankruptcy documents violated ABA Model Rule 8.4(c) and (d)).

But Mr. Barclay did much more in violation of Colo. RPC 8.4. He lied repeatedly to the Chapter 7 Trustee at the Section 341 meeting regarding the whereabouts of the Debtors and efforts to ensure the Debtors' participation in the mandatory Section 341 meeting. Such deceit was especially egregious since the Chapter 7 Trustee is an officer of the Court and functions in an important fiduciary capacity for the benefit of all creditors and parties in interest. Mr. Barclay knowingly advised the Debtors to not fulfill their statutory duty of attendance at the Section 341 meeting. And, he counseled the Debtors to violate the Filing Fee Order (an order which itself had been obtained by fraud) by not paying the filing fee installments which the Debtors were financially obligated and able to

pay.  Mr. Barclay made numerous oral misrepresentations to the Court regarding the Debtors' pay advices which caused the Court to schedule an evidentiary hearing on such matters.  He intentionally interfered with the Chapter 7 Trustee's administration of the Main Case by refusing to comply with both informal and formal discovery requests.  He caused the Debtors to be sanctioned for misconduct which was entirely due to his own behavior.

If the foregoing was not bad enough, Mr. Barclay engaged in other appalling misconduct which adversely reflects on his fitness to practice law.  He solicited harm to an opposing lawyer — counsel for the Chapter 7 Trustee.  This is what Mr. Barclay told his clients (the Debtors) to do before mailing documents to the Chapter 7 Trustee's counsel:

> If either of you have COVID or some other highly infectious, nasty disease — or if you know someone who does — please make sure they lick the envelope and handle it as much as possible.

To characterize such advice as outrageous is a gross understatement.

Demonstrating that none of the foregoing was some sort of one-off mistake, even after some of Mr. Barclay's malfeasance was uncovered, he doubled down and made a final improper effort to manipulate the Main Case and the bankruptcy system.  The morning after the initial hearing on the Main Case Order to Show Cause, Mr. Barclay prepared and sent the BC Services E-Mail to BC Services as part of a scheme to deceive the Court into dismissing the Main Case pursuant to Section 521(e)(2)(C).  He tried to convince BC Services to make a request for the Debtors' tax returns.  Then, even though Mr. Barclay had the Debtors' tax returns, he proposed to engage in a complete farce: "we will willfully not comply with that request."  Next, Mr. Barclay asked BC Services to file a motion to dismiss premised upon Mr. Barclay's own willful non-compliance.  Mr. Barclay offered to draft the motion to dismiss himself so the Court would not know about the scheme.  Then, Mr. Barclay committed to pay BC Services (in preference to other creditors and "to compensate BC Services for its time and cooperation") for helping to engage in the fraud.  After his misconduct was discovered, Mr. Barclay sent a further email to BC Services and tried to hide under a bogus assertion that the BC Services E-Mail was "privileged in nature and content" and a "confidential settlement offer."  Moreover, he never told his clients (the Debtors) about his scheme.  Someone who does something like that plainly commits professional misconduct, violates Colo. RCP 8.4, and should not be practicing law.

2.   **Mr. Barclay Violated Colo. RPC 4.1.**

Colo. RPC 4.1 deals with misrepresentations made to third persons and provides:

> In the course of representing a client a lawyer shall not knowingly: (a) make a false statement of material fact or law to a third person; or (b) fail to disclose a material fact to a third

person when disclosure is necessary to avoid assisting a
criminal or fraudulent act by a client, unless disclosure is
prohibited by Rule 1.6.

"Omissions or partially true but misleading statements can be the equivalent of affirmative
false statements."  Colo. RPC 4.1, Comment [1].

Most of Mr. Barclay's violations of Colo. RPC 8.4 also constitute violations of Colo.
RPC 4.1.  For example, since part of the purpose of the documents Mr. Barclay filed in
the Main Case (such as the Petition, Statement of Financial Affairs, Declaration for the
Debtors' Schedules, First Motion to Dismiss, and Second Motion to Dismiss) was to
inform creditors and other parties in interest, the material misrepresentations made
therein also were directed to third parties.  Furthermore, by telling the Chapter 7 Trustee
at the Section 341 meeting that he had tried to contact the Debtors by phone and had not
been able to reach them, and by omitting from that discussion that the Debtors were
willfully failing to appear at the Section 341 meeting in reliance on Mr. Barclay's advice,
Mr. Barclay made a false statement of material fact to the Chapter 7 Trustee in violation
of Colo. RPC 4.1.  Mr. Barclay also violated Colo. RPC 4.1 by failing to disclose to BC
Services that he was engaged in a charade to obtain dismissal of the Main Case on the
pretense of failing to disclose the Debtors' tax returns even though Mr. Barclay had
possession of the tax returns.  His subsequent attempt to cover up the fraudulent nature
of his proposal to BC Services by asserting that the BC Services E-Mail was "privileged in
nature and content" and a "confidential settlement offer" constituted more material
misrepresentations of facts and law to a third person.

### 3.  **Mr. Barclay Violated Colo. RPC 1.1.**

The first ethical rule is Colo. RPC 1.1 which speaks to attorney competency:

A lawyer shall provide competent representation to a client.
Competent representation requires the legal knowledge, skill,
thoroughness and preparation reasonably necessary for the
representation.

From start to finish, Mr. Barclay's representation of the Debtors was incompetent.
Even worse, he engaged in intentional bad-faith misconduct.  He commenced the Main
Case without obtaining final approval from the Debtors and without securing the Debtors'
signatures in advance.  He filed multiple documents (such as the First Motion to Dismiss
and Second Motion to Dismiss) with no reasonable advance investigation and no basis in
fact or law.  He submitted the Filing Fee Application (which itself was false) without
authorization.  He failed to inform the Debtors of the Chapter 7 Trustee's repeated
informal and formal requests for documents and information.  He caused his clients to be
sanctioned for violation of the Turnover Order.

Rather than provide competent legal advice, Mr. Barclay engaged in a bizarre
gamesmanship in the bankruptcy process.  After finding that a Chapter 7 Trustee not to
his liking had been appointed in the Main Case, Mr. Barclay attempted to use a series of

deceitful artifices to obtain dismissal of the Main Case.  He advised the Debtors not to participate in the Section 341 meeting which all debtors are required to attend.  He counseled his clients to violate the Filing Fee Order and not pay the mandatory filing fee installments.  He misrepresented the status of pay advices to the Court.  And, then, through the BC Services E-Mail, Mr. Barclay planned to con the Court into dismissing the Main Case on a false pretense (*i.e.,* his failure to produce the Debtors' tax returns even though he had the tax returns).  All of the foregoing conduct establishes that Mr. Barclay violated Colo. RPC 1.1 by providing incompetent legal services to the Debtors.

### 4.  <u>Mr. Barclay Violated Colo. RPC 3.3.</u>

Colo. RPC 3.3 is titled "Candor Toward the Tribunal" and prohibits an attorney from knowingly "mak[ing] a false statement of material fact or law to a tribunal or fail[ing] to correct a false statement of material fact or law previously made to the tribunal by the lawyer . . . ."  Again and again, Mr. Barclay violated this fundamental canon of legal practice.  He forged the Debtors' signatures on the Petition, Statement of Financial Affairs, Declaration for the Debtor's Schedule, and the Filing Fee Application all filed with the Court.  He knowingly submitted a false Schedule A/B.  He asserted in the Filing Fee Application that the Debtors were "unable to pay the full filing fee at once" even though he knew full well that the Debtors could do so.  Mr. Barclay's misrepresentation caused the Court to issue the Filing Fee Order.  Mr. Barclay made false statements about pay advices in the First Motion to Dismiss, the Second Motion to Dismiss, and at hearings.  Then, he declined to correct the errors after it became obvious that his prior representations were untrue.  He lied to the Court in the "Response to Order to Show Cause" wherein he advised that the Debtors had complied with the Turnover Order.  His pattern of deceit was one reason the Court sanctioned the Debtors.  Rather than candor toward the tribunal, Mr. Barclay's conduct demonstrated only disdain for the Court, the Chapter 7 Trustee, creditors, and the bankruptcy process.  Plainly, Mr. Barclay violated Colo. RPC 3.3.  *See Husain*, 533 B.R. at 695-96 (attorney who signed documents for clients, had clients sign incomplete documents and reused client signatures violated ABA Model Rule 3.3).

### 5.  <u>Mr. Barclay Violated Colo. RPC 1.4.</u>

Colo. RPC 1.4 is directed toward the attorney-client relationship and mandates:

(a)   A lawyer shall:

(1)   promptly inform the client of any decision or circumstance with respect to which the client's informed consent, as defined in Rule 1.0(e), is required by these Rules;

(2)   reasonably consult with the client about the means by which the client's objectives are to be accomplished;

     (3)     keep the client reasonably informed about the status of the matter;

     (4)     promptly comply with reasonable requests for information; and

     (5)     consult with the client about any relevant limitation on the lawyer's conduct when the lawyer knows that the client expects assistance not permitted by the Rules of Professional Conduct or other law.

     (b)     A lawyer shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.

Stripped to its essence, Colo. RPC 1.4 demands that lawyers keep their clients informed so that their clients can make informed decisions.  Mr. Barclay's misconduct can best be characterized as the antithesis of Colo. RPC 1.4.  From the get-go, he kept the Debtors constantly in the dark.  He did not receive final authorization to commence the Main Case but did so anyway.  He did not let the Debtors know that he had filed the Petition until days later.  He did not tell the Debtors that he had filed an incorrect Schedule A/B.  Mr. Barclay hid from the Debtors that he forged their signatures on the Filing Fee Application and filed a false Filing Fee Application.  He failed to disclose to his clients that he lied at the Section 341 meeting of creditors about the Debtors' whereabouts.  Mr. Barclay directed the Debtors not to pay a filing fee installment without disclosing all the consequences of a willful failure to comply with the Filing Fee Order.

Mr. Barclay's malfeasance in the discovery process took on a life of its own.  He never told the Debtors about the Chapter 7 Trustee's numerous informal requests for information.  He failed to inform the Debtors about the Motion to Compel.  Instead, Mr. Barclay filed an unauthorized objection to the Motion to Compel with no factual or legal basis.  Thereafter, he declined to inform the Debtors about the Turnover Order.  So, the Debtors (not knowing about it) failed to comply with the Turnover Order.  Because of Mr. Barclay's misconduct and failure to communicate with the Debtors, the Debtors were sanctioned.

Toward the end of his work in the Main Case, Mr. Barclay developed a haphazard scheme to defraud the Court through the BC Services E-Mail.  The Debtors knew nothing about the BC Services E-Mail because Mr. Barclay did not send them a copy and never mentioned it.  The Debtors did not authorize Mr. Barclay to communicate with BC Services at all.  After the BC Services E-Mail surfaced (because BC Services sent it to the Chapter 7 Trustee), Mr. Barclay did not bother to tell the Debtors.  The first they heard about it was when the BC Services E-Mail was read in open court and they realized that their lawyer was engaged in "fraudulent activity."  Later, after being advised about the extent of Mr. Barclay's malfeasance, the Debtors were "appalled."  Suffice to say that Mr. Barclay's violations of Colo. RPC 1.4 are patent.

**F.**     **Both Mr. Barclay and DBPC Are Liable for the Misconduct of Mr. Barclay.**

Mr. Barclay is the sole owner of DBPC.  He elected to create DBPC as a vehicle for providing legal services to his clients.  In the Main Case, Mr. Barclay acted through DBPC at all times in his representation of the Debtors.  With respect to all documents Mr. Barclay filed in the Main Case, he listed his affiliation with DBPC.  In communications with the Debtors and third parties (such as BC Services), Mr. Barclay utilized a DBPC e-mail address.  The draft Representation Agreement was between the Debtors and DBPC and provides for the Debtors' retention of DBPC.   Accordingly, DBPC is liable for Mr. Barclay's misconduct to the same extent that Mr. Barclay is.

**G.**     **The Defendants Must Be Sanctioned.**

The UST has proven beyond peradventure each of the five Causes of Action asserted in the Complaint against the Defendants.  All that remains is for the Court to select the right sanction.

With respect to the First Cause of Action (violations of Fed. R. Bank. P. 1008 and 9011(b) and (f)), Fed. R. Bankr. R. 9011(c) authorizes the Court to "impose an appropriate sanction upon the attorneys, law firms, or parties that have violated subdivision (b) or are responsible for the violation." Fed. R. Bankr. P. 9011(c); *see also*, *Stomberg*, 487 B.R. at 807 ("Rule 1008 is related to Rule 9011(b) because, by failing to obtain the debtor's verification as to the accuracy of the documents he files, an attorney falsely represents to the court that 'the allegations and other factual contentions have evidentiary support.'").  Fed. R. Bankr. P. 9011(c)(2) gives more specificity about possible sanctions:

> A sanction imposed for violation of this rule shall be limited to what is sufficient to deter repetition of such conduct or comparable conduct by others similarly situated . . . .  [T]he sanction may consist of, or include, directives of a nonmonetary nature, an order to pay a penalty into court, or . . . an order directing payment to the movant of some or all of the reasonable attorneys' fees and other expenses incurred as a direct result of the violation.

The foregoing list is non-exclusive.  The Court can also suspend an attorney from practicing law before the Court.  *In re Brooks-Hamilton*, 400 B.R. 238, 249 (9th Cir. BAP 2009).

With respect to the Second and Third Causes of Action (violations of Sections 526(a)(1), (a)(2), and (a)(3)), Section 526(c)(5) identifies several potential remedies:

> . . . in addition to any other remedy provided under Federal or State law, if the court, on its own motion or on the motion of the United States trustee or the debtor, finds that a person

intentionally violated this section, or engaged in a clear and consistent pattern or practice of violating this section, the court may —

(A)     enjoin the violation of such section; or

(B)     impose an appropriate civil penalty against such person.

Section 526(c)(5) "creates two distinct categories of violations . . . (1) an individual violation that is 'intentional,' and (2) a 'clear and consistent pattern or practice' of violations." *Hobbs v. Chesson*, 2018 WL 4172667, at \*12 (Bankr. W.D. La. Aug. 29, 2018).  For purposes of Section 526(c)(5), an intentional violation may be established through circumstantial evidence.  *Law Sols. of Chicago LLC v. Corbett*, 2019 WL 1125568, at \*7 (N.D. Ala. Mar. 12, 2019), *aff'd*, 971 F.3d 1299 (11th Cir. 2020) ("'Because direct evidence of intent is rarely available, a court may infer intent from the totality of the circumstances,' and reckless indifference may be sufficient to establish intent in some cases." (citation omitted)).  For instance, an attorney's failure to take legal obligations seriously or to make an effort to comply with the law constitutes intentional conduct.  *Id.*  Reckless disregard for the truth of the matter asserted is sufficient to establish that a false or misleading statement was made intentionally.  *Id.*  "The requirement of intent does not apply to the second – 'clear and consistent pattern or practice' – category based on the text of the statute*." Hobbs,* 2018 WL 4172667, at \*12.  Instead, a court may find a clear and consistent pattern or practice exists through evidence that the violation was part of "a standard or routine way of operating." *Corbett* 2019 WL 1125568 at \*8 (quoting *In re Maxwell*, 281 B.R. 101, 123 (Bankr. D. Mass. 2002)); *In re Cook*, 610 B.R. 852, 867 (Bankr. N.D. Ill. 2019) ("A civil penalty for repeated violations of its statutory obligations and the choice to bury its head in the sand and ignore an obvious issue is therefore appropriate.").  The Defendants have admitted that all the actionable "untrue or misleading" statements violating Section 526(a)(2) and the "fail[ures] to perform" and misrepresentations violating Sections 526(a)(1) and (a)(3) were intentional.[163]  And, their actions show a "clear and consistent pattern or practice of violations" even though in the context of a single bankruptcy case.  Thus, both injunctive relief and civil penalties are available as remedies per Section 526(c)(5).  And the injunctive relief may include barring an attorney from practicing law in a bankruptcy court.  *Burnett,* 2022 WL 802586, at \*13; *In re Fahey*, 2009 WL 2855728, at \*8 (Bankr. S.D. Tex. Sept. 1, 2009).

With respect to the Fourth Cause of Action (violations of Section 528(a)), Section 526(c)(1) provides that a contract for bankruptcy services which fails to comply with any of the material requirements of Sections 526, 527, or 528, "shall be void and may not be enforced by any Federal or State court or by any other person, other than such assisted person." 11 U.S.C. § 526(c)(1).  Section 526(c)(2) states an additional remedy:

Any debt relief agency shall be liable to an assisted person in the amount of such fees or charges in connection with

---

[163]     Compl. ¶¶ 169 and 179.

38

> providing bankruptcy assistance to such person that such debt
> relief agency has received, for actual damages, and for
> reasonable attorneys' fees and costs if such agency is found,
> after notice and a hearing to have . . . intentionally or
> negligently failed to comply with any provision of . . . section
> 528 with respect to a case or proceeding under this title for
> such assisted person . . . .

Finally, with respect to the Fifth Cause of Action (violations of professional duties), the Colo. RPC do not specify any remedies for violations of any of its Rules.  "The Rules are designed to provide guidance to lawyers and to provide a structure of regulating conduct through disciplinary agencies."  Colo. RPC Preamble [20].  Instead, the Court's authority to impose sanctions derives from its inherent power to sanction conduct abusive of the judicial process and Sections 105 and 526.  *Chambers*, 501 U.S. at 50; *Courtesy Inns*, 40 F.3d at 1089.  The range of potential sanctions include nonmonetary sanctions, monetary sanctions, disallowance of fees, disgorgement of fees, referral to state or federal disciplinary investigations, suspension from practicing law in the Court for a fixed period, and disbarment.

During his closing argument, the UST requested that the Court enter three types of relief:  First, the UST asks that the Court enjoin Mr. Barclay "from providing any bankruptcy services in relation to cases filed, or to be filed, in [the Court]" for "a period of seven years beginning on the date of the [Court's Order]."[164]  Following the expiration of the injunctive term, the UST proposes that Mr. Barclay be permitted to file an application with the Court "demonstrating good cause for why he should be allowed to resume filing cases in this jurisdiction, which shall be granted or denied in the discretion of the Court."[165]  The UST suggests that DBPC may be allowed to provide legal services utilizing attorneys other than Mr. Barclay who Mr. Barclay would supervise.  Second, the UST requests that any contract between the Defendants and the Debtors be declared void and unenforceable.  Finally, the UST wants the Court to refer Mr. Barclay's misconduct to the Disciplinary Panel or the Committee on Conduct of the District Court for possible further action (such as a bar on Mr. Barclay appearing in the District Court).  Provided that the Court enters the requested remedies, the UST maintains that additional monetary sanctions against the Defendants are unnecessary.[166]  Notably, the Defendants have not opposed the relief requested in the Complaint as further refined by the UST during his closing argument.  Indeed, the Defendants did not bother with appearance at the trial, presented no mitigating evidence, and did not suggest any alternative remedies.

---

[164]    Docket No. 57-1, Attachment A.

[165]    *Id.*

[166]    During closing argument at the trial, the UST refined his requests for relief.  For example, in the Complaint, the UST suggested that Mr. Barclay be prohibiting from practicing law "for such period of time as the Court deems appropriate."  However, in closing argument and the proposed order, the UST requested that Mr. Barclay be enjoined from practice for a set period: seven years.  In the Complaint, the UST advocated for unspecified monetary sanctions.  In closing argument, however, the UST retracted that request arguing that the Debtors and the estate had been made whole.

Since the conclusion of the trial, the Court has carefully considered the right sanctions to impose. *See In re Nguyen*, 447 B.R. 268, 276 (9th Cir. BAP 2011) (appellate court should assess whether: "(1) the disciplinary proceeding is fair, (2) the evidence supports the findings, and (3) the penalty imposed was reasonable."). The Court afforded the Defendants with fair and full due process in this Adversary Proceeding. The basic components of due process are notice that the Court is considering sanctions and an opportunity for the attorney accused of misconduct to respond. *Braley v. Campbell,* 832 F.2d 1504, 1514 (10th Cir. 1987). Even though the Defendants had an opportunity to contest the factual allegations and remedies requested by the UST in the Complaint (over a period of more than eight months), the Defendants ultimately chose not to oppose anything. So be it; but the Defendants definitely had their day in Court. And, the evidence (including the Defendants' admissions) supports all of the Court's factual findings. What remains is to fashion reasonable sanctions under the circumstances. Reasonableness requires "that the sanction imposed be within the scope of the bankruptcy court's authority and that the sanction be tailored to address the conduct." *Nguyen,* 477 B.R. at 280.

Given the gravamen of Mr. Barclay's misconduct, there can be no doubt — no doubt whatsoever — that very serious sanctions must be imposed on the Defendants. After all, the malfeasance was intentional and committed in bad faith resulting in serious abuse of the bankruptcy process. And the misconduct (albeit occurring only in the Main Case)[167] was systematic and continuous, not some sort of one-time mistake.

Ultimately, the Court concurs with the UST that the Defendants should be suspended from practicing law in the Court for some fixed period of time. Although such an injunction appears to be authorized under Section 526(c) and Fed. R. Bankr. P. 9011, the Court also invokes its inherent authority (as confirmed in Section 105(a)) to control egregious lawyer misconduct. The use of inherent power is necessary in this Adversary Proceeding because "neither the statute nor the Rules" alone are "up to the task." *Chambers*, 501 U.S. at 50 ("the inherent power of a court can be invoked even if procedural rules [*e.g.* Fed. R. Civ. P. 11] exist which sanction the same conduct").

The inherent power to prevent abuse of process by lawyers allows bankruptcy courts to discipline the attorneys who appear before them, including by suspending lawyers from appearing and practicing law in bankruptcy courts. *See Williams v. Lynch (In re Lewis)*, 611 Fed. Appx. 134, 136 (4th Cir. 2015) (unpublished); *Ginsberg,* 570 F.3d at 1280 (affirming bankruptcy court's five-year suspension of an attorney and his firm from practicing before the bankruptcy court); *In re Evans,* 801 F.2d 703, 706 (4th Cir.1986) ("A court has the inherent authority to disbar or suspend lawyers from practice ... derived

---

[167]     The Court is quite familiar with Mr. Barclay. In recent years, he has commenced hundreds of bankruptcy cases as counsel of record. The Court has harbored some suspicions regarding his conduct. For example, Mr. Barclay has filed applications for fee installment payments contending that virtually all of his clients are unable to pay bankruptcy filing fees in full when their cases start. That approach is unusual: other attorneys and debtors not utilizing Mr. Barclay's services do not universally assert that they are unable to pay filing fees in full. The Court has some other concerns with Mr. Barclay's work in other cases. However, in this Adversary Proceeding, the UST only introduced evidence regarding Mr. Barclay's malfeasance in the Main Case. Accordingly, in its consideration of sanctions, the Court has limited its analysis only to Mr. Barclay's misconduct in the Main Case.

from the lawyer's role as an officer of the court."); *Dobbs*, 535 B.R. at 699 (permanently disbarring attorney for pattern of malfeasance); *Husain*, 533 B.R. at 697-700 (permanently suspending attorney from practice of bankruptcy law for repeatedly signing documents for clients, having clients sign incomplete documents, and reusing client signatures); *T.H.*, 529 B.R. at 146-47 (suspending bankruptcy lawyer from practice for 60 days based upon numerous violations of statutes and rules); *Seare,* 515 B.R. at 615 (affirming bankruptcy court's monetary and non-monetary sanctions against attorney based, in part, on failure of lawyer to comply with rules of professional conduct); *Parker*, 466 B.R. at 548-51 (upholding bankruptcy court's decision to suspend attorney for repeatedly failing to remit filing fees and making other false and misleading statements to the court); *In re MPM Enters,* 231 B.R. 500, 504 (D. E.D.N.Y. 1999) (finding Court had inherent power "to permanently bar an attorney from appearing in any Bankruptcy Court in the Eastern District."); *Ludwick,* 185 B.R. at 247 (imposing a two-year suspension for attorney who forged debtor signature); *In re Nesom,* 76 B.R. 101, 102 (Bankr. N.D. Tex. 1987) (finding bankruptcy attorney subject to sanctions, including 60–day suspension, for forging debtor's signature on statement of affairs, schedules, and schedule of current income).  The foregoing authorities all support the Court suspending the Defendants from the practice of law for a fixed period.

Proceedings for disbarment or suspension "are not for the purpose of punishment, but rather seek to 'determine the fitness of an officer of the court to continue in that capacity and to protect the courts and the public from the official ministration of persons unfit to practice.'"  *Husain*, 533 B.R. at 697 (quoting *In re Echeles*, 430 F.2d 347, 349-50 (7th Cir. 1970)).  The Court takes no pleasure in suspending the Defendants from practicing bankruptcy law in the Court.  It is a sad day for the profession and the Court. But, the Court has a duty to protect the Court and the public from the type of malfeasance perpetrated by the Defendants.

In determining the type of sanction to impose, the Court considers both the severity of the violations and what is necessary to protect the integrity of the Court and the profession.  The Court also has exhaustively canvassed the caselaw (cited immediately above) which strongly supports suspension as a reasonable remedy in the type of circumstances outlined in the Complaint.  As advocated by the UST, the Court also has considered the American Bar Association's Standards for Imposing Lawyer Sanctions (the "ABA Standards"), which are not binding on the Court.  ABA JOINT COMM. ON PRO. SANCTIONS, STANDARDS FOR IMPOSING LAWYER SANCTIONS Standard 1.3 (2005)**.**  *See Nguyen*, 447 B.R. at 277 (ABA Standards "remain a helpful guide in the imposition of sanctions" but their consideration is not mandated); *Husain*, 533 B.R. at 698 (considering ABA Standards in determining appropriate sanction).

ABA Standards § 2 identifies the following as potential disciplinary sanctions: disbarment; suspension; interim suspension; reprimand; admonition; probation; restitution; assessment of costs; limitation on practice and other remedies.[168]  ABA Standards § 3 provides guidance on how to select amongst the available sanctions:

---

[168]     In the vernacular of the ABA Standards, "[d]isbarment terminates the individual's status as a lawyer" while "suspension is the removal of a lawyer from the practice of law for a specified minimum period of time" greater than six months but less than three years.  ABA Standards §§ 2.2 and 2.3.

In imposing a sanction after a finding of lawyer misconduct, a court should consider the following factors: (a) the duty violated; (b) the lawyer's mental state; (c) the potential or actual injury caused by the lawyer's misconduct; and (d) the existence of aggravating or mitigating factors.

The Court already has exhaustively identified the duties violated by the Defendants.  Mr. Barclay violated: Sections 526(a)(1), (a)(2), and (a)(3); Section 528; and Fed. R. Bankr. P. 1008 and 9011(b) and (f).  He also violated professional duties owed to the Court, the Debtors, and the public.  He engaged in repeated dishonesty, fraud, deceit, and misrepresentations.  He committed malfeasance prejudicial to the administration of justice.  He forged signatures.  He promoted physical harm to opposing counsel through infection with a deadly disease.  He provided incompetent legal services to the Debtors.  He caused his clients to be sanctioned for his own misconduct.  He repeatedly failed in his duty of candor to the Court.  And he tried to recruit a third-party creditor to participate in a scheme to defraud the Court, the Chapter 7 Trustee, and other creditors by securing dismissal of the Main Case.

ABA Standards § 4.62 suggests that "[s]uspension is generally appropriate when a lawyer knowingly deceives a client, and causes injury or potential injury to the client."  ABA Standards § 6.12 is similar and indicates that "[s]uspension in generally appropriate when a lawyer knows that false statements or documents are being submitted to the court . . . and takes no remedial action, and causes injury or potential injury to a party . . . or causes an adverse or potentially adverse effect on the legal proceeding."  ABA Standards §§ 4.42, 6.22, 6.32, and 7.2 also counsel that suspension is the recommended sanction in the type of circumstances proven in this Adversary Proceeding.

Regarding the Mr. Barclay's mental state, in response to the Order to Show Cause Mr. Barclay claimed to have been diagnosed with "Adjustment Disorder," which he characterized as a "physical reaction to psychological trauma" caused by this Adversary Proceeding.  But the Court did not receive any admissible evidence on the topic.  At trial, Mr. Barclay failed to present any mitigation evidence about his mental state or otherwise.  Given the dearth of information, the Court is not able to weigh Mr. Barclay's mental state in the sanctions calculus.

With respect to the injuries caused by the Defendants, Mr. Barclay harmed his clients.  Among other things, the Debtors were sanctioned for failure to turn over information to the Chapter 7 Trustee.  But the noncompliance with the Turnover Order was due entirely to Mr. Barclay's conduct.  Mr. Barclay also harmed his clients in other ways, including not keeping them apprised of the Main Case and rendering incompetent legal services.  He unnecessarily prolonged their case and instigated much unnecessary litigation.  In addition, Mr. Barclay harmed the Chapter 7 Trustee.  He impeded the Chapter 7 Trustee's investigation into the Debtors' assets.  And he caused the Chapter 7 Trustee to incur legal fees and costs because of his malfeasance.  Mr. Barclay also interfered with the administration of justice in the Main Case.

So, after consideration of the threshold ABA Standards, suspension appears to be the recommended course (before assessment of aggravating and mitigating circumstances).  ABA Standards § 9.22 lists eleven "aggravation factors" while ABA Standards § 9.32 identifies thirteen "mitigation factors."  The Court has considered all the aggravation factors and mitigation factors.  The Court did not receive any admissible evidence about most of the factors.  And many of the remaining factors do not apply to the factual circumstances presented in this Adversary Proceeding.  In the end, the Court tallies a few aggravation factors: a pattern of misconduct; and multiple offenses.  On the other side, no mitigation factors have been established.  So, the aggravation factors and mitigation factors are mostly a wash and do not change suspension as the most appropriate remedy.

Recognizing that suspension from practice is a severe sanction, the Court determines that a lesser sanction (such as reprimand, admonition, or monetary sanctions) would not adequately address Mr. Barclay's gross malfeasance in the Main Case and his intentional bad-faith abuse of the bankruptcy system.  However, in exercising its discretion, the Court concludes that the seven-year suspension term proposed by the UST is too long.  Instead, the Court determines that a three-year suspension is best tailored to the circumstances and would still permit Mr. Barclay to return to practice in the Court if he is able to do so in compliance with the provisions of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Colorado Rules of Professional Conduct.  Given the severity of the sanction, the Court also determines that no additional monetary sanctions are warranted.

With respect to the extension of such suspension to DBPC, the Court parts ways with the UST because the Court sees no way that DBPC can be permitted to practice law with Mr. Barclay at the helm.  After all, he is the sole owner of the law firm.  He controls it completely.  All of the misconduct proved in the Adversary Proceeding was done under the umbrella and name of DBPC too.  So DBPC is responsible.  DBPC may or may not have other lawyers.  The Court received no admissible evidence on that issue.  But even if other lawyers are employed at DBPC, Mr. Barclay (who will be suspended from the practice of law for several years) is in no position to control and supervise such other counsel.  So, the suspension sanction will be extended to include DBPC too.

The UST also requested two other sanctions: nullification of any contract between the Defendants and the Debtors; and referral to the Disciplinary Panel or Committee on Conduct of the District Court.  Any contract between the Defendants and the Debtors is void as a function of Sections 526(c)(1) and 528(a).  So, the Court concurs.  The proposed referral to the Disciplinary Panel or Committee on Conduct of the District Court requires just a bit more analysis.

Local Bankruptcy Rule 9010-1(a) states that the "Local Rules of Practice of the United States District Court for the District of Colorado, Section V – Attorney Rules will apply" to the practice of law before the Bankruptcy Court.  Section V Part V of the Local Rules of Practice of the District Court provides a comprehensive system for attorney discipline through both a Disciplinary Panel and a Committee on Conduct.  The Disciplinary Panel, which is composed of judicial officers, "shall have jurisdiction over all

judicial proceedings involving disbarment, suspension, censure, or other attorney discipline."  D.C. Colo.L.Atty.R. 6(a).  The Committee on Conduct is charged with investigating attorney misconduct and may issue a letter of admonition if the misconduct does "not warrant submitting charges to" the Disciplinary Panel.  D.C. Colo.L.Atty.R. 6(b)-(c), 7(d), and 7(e)(2) and (3).  The Committee on Conduct may "prepare charges and submit them" to the Disciplinary Panel in more serious cases.  D.C. Colo.L.Atty.R. 7(e)(3).  The Disciplinary Panel is authorized to conduct hearings and "censure, suspend, disbar, or otherwise discipline" attorneys who commit misconduct.  D.C. Colo.L.Atty.R. 7(f).  So, there is a fulsome mechanism available to discipline lawyers practicing in the District Court.  But that system is not the exclusive method for disciplining attorneys.  D.C. Colo.L.Atty.R. 1(d) states:  "Nothing stated in these rules shall be deemed to negate or diminish the express or inherent disciplinary powers of the court or a judicial officer."  *See Nguyen*, 447 B.R. at 281 ("plain language of the Local [District Court] Rule does not restrict the bankruptcy court's inherent authority" to sanction attorneys).

The Court has elected to adjudicate this Adversary Proceeding and issue this Memorandum Opinion rather than initially referring the matter to the Disciplinary Panel or the Committee on Conduct of the District Court for several reasons.  First, this Adversary Proceeding was properly commenced in this Court by the UST and seeks the imposition of sanctions pursuant to several parts of the Bankruptcy Code (Sections 105(a), 526, and 528) and Fed. R. Bankr. P. 1008 and 9011.  These bankruptcy-specific matters seem best addressed by the Court rather than through wholesale referral.  Indeed, the issues presented are "core proceedings" generally within the purview of the Bankruptcy Court per 28 U.S.C. §§ 157(b)(2)(A) and 1334.  And, the Tenth Circuit Court of Appeals has instructed that "overseeing lawyers who represent bankruptcy debtors" is one of the "core and traditional role[s]" of bankruptcy judges.  *Stewart*, 970 F.3d at 1258.  Second, although the Court also is applying its inherent power to sanction, in the circumstances of this Adversary Proceeding such inherent power is intertwined with the sanctions available under bankruptcy statutes and procedural rules.  The Court ascertains no sound way to split the issues.  Third, as a matter of judicial efficiency and economy the Court has chosen to address all of the matters raised in the Complaint together.  Fourth, the Defendants have not argued for a wholesale referral of the matters raised in the Adversary Proceeding to the Disciplinary Panel or the Committee on Conduct of the District Court.  Finally, the UST has requested that the Court adjudicate this Adversary Proceeding and issue judgment on all the Causes of Action.  As part of that process, the UST has requested that the Court refer any remaining issues to the Disciplinary Panel or the Committee on Conduct of the District Court.

Since the Court already has decided to impose sanctions on the Defendants including suspending the Defendants from practicing law in the Court, the only matter remaining is whether additional sanctions are warranted such as suspending the Defendants from practicing law in the District Court.  In the judicious exercise of its discretion, the Court declines to enter an injunction governing practice in the District Court.  That matter is best left to the Disciplinary Panel or the Committee on Conduct of the District Court.  Toward that end, the Court directs the Defendants to promptly submit a copy of this Memorandum Opinion to the Disciplinary Panel and the Committee on Conduct of the District Court.  Additionally, the Court clarifies that the UST also may elect

to file a complaint with the Disciplinary Panel or the Committee on Conduct of the District Court pursuant to D.C. Colo.L.Atty.R. 7; provided, however, that any such complaint shall only seek additional relief pertaining specifically to the Defendants' ability to practice in the District Court. The Court also directs the Defendants to promptly submit a copy of this Memorandum Opinion to the Office of Attorney Regulation of the Colorado Supreme Court.

## VII.   Conclusion and Order.

Accordingly, for the reasons set forth above, the Court Orders:

1.      The Defendants (Devon Michael Barclay and Devon Barclay, P.C.) are suspended immediately from practicing law before the United States Bankruptcy Court for the District of Colorado for a period of three years from the date of this Memorandum Opinion. For the sake of clarity, this suspension covers not only debtor representation but any form of representation before the United States Bankruptcy Court for the District of Colorado. It applies not only to future cases but to all pending cases as well.

2.      The Clerk of Court shall deactivate the electronic filing privileges of the Defendants as of **January 25, 2023**. This slight delay in deactivation is intended to allow the Defendants time to file any necessary motions to withdraw. However, even though the deactivation of filing privileges will not occur until **January 25, 2023**, the Defendants are immediately prohibited from filing any new bankruptcy cases or engaging in any form of legal representation except filing motions to withdraw.

3.      The Defendants shall file motions to withdraw or substitute counsel (citing this Memorandum Opinion) in all bankruptcy cases pending in the United States Bankruptcy Court for the District of Colorado in which the Defendants are counsel of record not later than **January 24, 2023**.

4.      The Court recognizes that the Defendants are counsel of record in many bankruptcy cases pending in the United States Bankruptcy Court for the District of Colorado. Such cases include proceedings under Chapter 7 and Chapter 13 of the Bankruptcy Code. The suspension of the Defendants from the practice of law may warrant adjustments to some of the deadlines established in other cases and may also create issues concerning the reasonableness of fees and the Defendants' retention of fees already paid in such other bankruptcy cases. However, the Court leaves to each Presiding Judge in such other bankruptcy cases the determination of whether any deadlines can or should be extended as a result of the suspension of the Defendants from the practice of law as well as issues pertaining to the reasonableness of attorneys' fees and potential disgorgement of attorneys' fees.

5.      The Defendants shall immediately cease any form of advertising indicating the Defendants are available to provide bankruptcy services during the term of their suspension from the practice of law in the United States Bankruptcy Court for the District of Colorado.

6.      This Memorandum Opinion does not suspend the Defendants from the practice of law in the United States District Court for the District of Colorado or the State Courts of the State of Colorado.  However, the Defendants shall promptly provide a copy of this Memorandum Opinion to the Disciplinary Panel and the Committee on Conduct of the United States District Court for the District of Colorado as well as the Office of Attorney Regulation Counsel of the Colorado Supreme Court and file a certificate of service and compliance with this Order in this Adversary Proceeding by **January 24, 2023**.

7.      Any contract between the Defendants and the Debtors is declared void.

8.      Upon the expiration of the three-year period of suspension, if the Defendants wish to practice law in the United States Bankruptcy Court for the District of Colorado, Mr. Barclay shall apply for reinstatement in this Court by moving to reopen this Adversary Proceeding, filing such a request, and serving notice of the request on the UST.  Any such application must provide a sufficient factual and legal basis to justify the Mr. Barclay continuing to practice law and must establish that: (1) Mr. Barclay is in good standing with the Colorado Supreme Court and the United States District Court for the District of Colorado; and (2) the Defendants have complied with all terms of this Memorandum Opinion.

DATED this 10th day of January, 2023.

BY THE COURT:

_Thomas B. McNamara_

Thomas B. McNamara,
United States Bankruptcy Judge